PATRICIA L. GILBERT, APPELLEE, v. JOHN R. HANLON,
COMMISSIONER OF LABOR, APPELLANT, MERLE'S FOOD
AND DRINK, APPELLEE.

335 N.W.2d 548

Filed June 17, 1983. No. 82-538.

Pamela A. Mattson, for appellant.

Vincent M. Powers, for appellee Gilbert.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and COLWELL, D.J., Retired.

KRIVOSHA, C.J.

This appeal presents the question as to whether an employee who voluntarily terminates part-time employment, while being discharged from full-time employment, thereby becomes disqualified for any benefits pursuant to the provisions of Neb. Rev. Stat. § 48-628 (Cum. Supp. 1980). The trial court found that the employee was not disqualified. On appeal we find that the trial court was correct in its conclusion, and affirm.

While there is a dispute as to whether the employee, Patricia L. Gilbert, voluntarily left her part-time employment before being discharged from her full-time employment, the principal issues of fact are without dispute. The evidence establishes without contradiction that from October 1974 to late August 1980, Gilbert was employed full-time as office manager at Central Heating and Air Conditioning. Also, from March of 1980 until late August of 1980, Gilbert worked as a part-time waitress at Merle's Food and Drink. Her part-time employment consisted of working on Thursday evenings and Saturdays between 5 to 11 hours a week at a rate of $3.25 per hour. The record discloses that during each of the last two calendar quarters of 1979 and the first calendar quarter of 1980, Gilbert earned $3,055 each quarter from her employment at Central Heating, and during the second quarter of 1980 Gilbert earned

$3,039.63 from Central Heating and $355.44 from her employment at Merle's. Sometime in July of 1980 she asked that her schedule be changed at Merle's so that she could have Saturdays off. Merle's refused to let her do so, and the record indicates that she voluntarily left her employment at Merle's. Her last day of employment at Merle's appears to be August 28, 1980, though there is some dispute about that fact. There is some confusion as to her last date of work at Central Heating. There is evidence to indicate that on the 28th she was told by Central Heating that she was laid off her full-time job, although she could continue to do bookkeeping 5 to 10 hours a week. Gilbert testified that the 28th was her last day at Merle's, which would be Thursday, but she also said that she worked that Friday, August 29, and that it was on Friday that she was laid off at Central Heating. Her forms seeking unemployment compensation, however, list August 28 as her last date at both Central Heating and Merle's. Regardless of the confusion which may exist as to the last day in which she in fact worked at either Merle's or Central Heating, we believe the record clearly establishes that she gave notice of her intention to voluntarily leave her part-time employment before she was advised that she was being laid off from her full-time employment.

On September 10, 1980, a notice of monetary determination was issued. This is simply a finding as to the maximum benefits Gilbert could receive if she remained eligible during the entire eligibility period as set by statute. Neb. Rev. Stat. § 48-630 (Reissue 1978). Gilbert's weekly benefit was set at $106. The total amount attributable to Central Heating was $2,638 and the total amount attributable to Merle's was $118, for a total maximum amount payable of $2,756. Twelve dollars was reduced on the line for Merle's, leaving Merle's total maximum liability at $106 and fixing the total maximum amount payable at $2,744.

On September 19, 1980, a notice of deputy's determination informed Gilbert that because she left her part-time employment with Merle's "due to personal dissatisfaction with scheduled hours of work and transportation costs" and her reasons for leaving were therefore "without good cause" under the Nebraska Employment Security Law, she was disqualified from receiving benefits for the week ending September 6, 1980, and likewise disqualified for an additional 7 weeks. The period of disqualification was set to end on October 25, 1980. The determination form listed only the account number for Merle's and did not indicate any separation from Central Heating. Gilbert then appealed to the Nebraska Appeal Tribunal and a hearing was held on October 27, 1980. The Nebraska Appeal Tribunal affirmed the determination made by the claims deputy. As we have indicated, on appeal the District Court reversed the determination of the Nebraska Appeal Tribunal and held that Gilbert's leaving of her part-time employment did not disqualify her from receiving benefits which she was otherwise entitled to receive by reason of her having been discharged from her full-time employment.

As we have indicated, the pertinent section involved in this case is § 48-628, which reads in part as follows: "An individual shall be disqualified for benefits: (a) For the week in which he or she has left work voluntarily without good cause, if so found by the Commissioner of Labor, and for not less than seven weeks nor more than ten weeks which immediately follow such week, as determined by the commissioner according to the circumstances in each case . . . ." While the language of § 48-628 appears clear on its face, when applied to the factual situation in this case the conflict becomes readily apparent. Section 48-628 apparently contemplates that an employee will have only one job at any one time, because it does not provide for what is to happen in the event of multiple jobs. Section 48-628

does not say that one is disqualified if he or she leaves "some of his or her work" or if he or she leaves "part of his or her work," or anything of that import. The commissioner advises us in his brief that it is his position that § 48-628(a) must be interpreted to apply to claimants who voluntarily leave *any* job, as the statute makes no distinction between quitting part-time and full-time employment. We believe that such an interpretation would be wholly inappropriate.

We believe that a more appropriate reading of both the language of § 48-628 and the intent and purpose of the Nebraska Employment Security Law (Neb. Rev. Stat. §§ 48-601 to 48-669) is to interpret § 48-628(a) such that one is disqualified for benefits if, by leaving work voluntarily without good cause, one thereby makes himself or herself "unemployed." Other courts which have examined similar provisions have reached similar conclusions.

In the case of *McCarthy v. Iowa Employment Sec. Comm.*, 247 Iowa 760, 76 N.W.2d 201 (1956), the Iowa Supreme Court was presented a case very similar to that presented to us by Gilbert. The claimant in the *McCarthy* case quit a part-time job not long before being laid off his full-time employment. Like the Nebraska statute, the Iowa statute provided in part: "An individual shall be disqualified for [unemployment] benefits . . . if he has left his work voluntarily without good cause attributable to his employer, if so found by the commission." Iowa Code § 96.5 (1954). In holding that the employee's leaving his part-time employment did not disqualify him for benefits which he would otherwise be entitled to from having been discharged from his full-time employment, the Iowa court said at 764, 76 N.W.2d at 203-04: "This subsection does not specify '*all* his work'; but neither does it say '*any* of his work' or '*part* of his work.' It seems not to recognize that there might be more than one 'work' and two or more concurrent employers. Some construction or

interpretation thus becomes necessary of a statute otherwise 'plain and unambiguous.'

". . . The words 'If he has left his work * * *' must be construed to mean 'If he has become unemployed * * *.' Only that interpretation accords with Code section 96.2 which states the very purpose of the legislation to be to require the compulsory setting aside of reserves 'for the benefit of persons *unemployed* through no fault of their own.' " (Emphasis in original.)

And, likewise, the Missouri Court of Appeals, in the case of *Brown v. Labor & Ind. Relations Com'n*, 577 S.W.2d 90 (Mo. App. 1978), made a similar finding under similar circumstances. In the *Brown* case the employees involved each held a part-time employment concurrently with full-time employment. Each voluntarily left the part-time employment and was thereafter terminated from the full-time employment. In allowing benefits for the termination of the full-time employment, the Missouri court said at 93: "The manifold purposes declared by the Employment Security Act are, among others, to relieve against economic distress from involuntary unemployment and to facilitate reemployment. . . .

". . . The public policy which girds the Employment Security Law that benefits shall be for *persons unemployed through no fault of their own* [citation omitted], therefore, is not infringed by a quittance, voluntary or involuntary, from a part-time employment to retain a full-time employment done without design to give up wage rewards for compensated unemployment." See, also, *Rodriguez v. Florida Dept. of Commerce, Ind. Rel. C.*, 328 So. 2d 24 (Fla. App. 1976); *Stauffer v. Com., Unemp. Comp. Bd. of Review*, 49 Pa. Commw. 284, 410 A.2d 972 (1980).

The commissioner argues that the *McCarthy* and *Brown* cases are not similar to the present case and can be distinguished. We are unable to make those distinctions.

The intent and purpose of the Employment Security Law, as observed by both the Iowa and Missouri courts, have been similarly declared by both our Legislature, in adopting the Employment Security Law, and our courts, in reviewing matters arising thereunder. Neb. Rev. Stat. § 48-627 (Reissue 1978) specifically provides that an unemployed individual shall be eligible to receive benefits with respect to any week only if the commissioner finds that "He is able to work, and is available for work." Obviously, one who is employed at a full-time job, though discharged from a part-time job, may not be eligible for work and, even though otherwise entitled to benefits, could not receive them. A further examination of the Nebraska Employment Security Law makes it clear that the Legislature was attempting to provide for those who were unemployed and therefore under economic distress. This court has made similar observations concerning the act. In *Woodmen of the World Life Ins. Society v. Olsen*, 141 Neb. 776, 778, 4 N.W.2d 923, 924 (1942), we said: "It was a legislative purpose to ameliorate ills growing out of labor troubles and unemployment. Protection of the public from pauperism and from other burdens created by unemployment was also in the minds of the lawmakers. The legislature considered these subjects and acted directly on them." We have likewise held that the purpose of the Employment Security Law is to protect all workmen involuntarily unemployed. See *Wentz Heating & Air Conditioning Co. v. Kiene*, 202 Neb. 202, 274 N.W.2d 547 (1979).

As we have already indicated, were we to take the commissioner's position, one who had worked for years at a full-time job and then took a part-time job selling on Thursday evenings, and who thereafter voluntarily quit the part-time employment in order to devote even more time to his or her full-time employment, might lose all the benefits of the Nebraska Employment Security Law by reason of hav-

ing taken this temporary part-time job. We cannot believe that this can be the purpose of the act, despite the commissioner's rationalization that benefits from the full-time job are only delayed for 8 weeks rather than lost entirely.

In the instant case, because of her employment with Central Heating, Gilbert, absent her employment with Merle's, was qualified for the maximum weekly benefit. Had she never taken the part-time job there would have arisen no doubt at all that she was eligible for full benefits, so long as she remained unemployed and eligible for work. Her part-time employment did not provide for her any greater weekly benefits, though it did add an additional $118 to the total maximum amount payable to her over the course of the benefit year. On the basis of that additional $118, the commissioner would have us deny to Gilbert 7 weeks of unemployment benefits. If the part-time employment had terminated under nondisqualifying circumstances, she would have received the same weekly check as she would otherwise have received, absent the part-time job, though she would have received benefits perhaps for an additional week, unless she otherwise found employment in the meantime. However, if Gilbert had never quit the part-time job and had kept earning at the same rate, approximately $27 per week, then she would have been earning too little each week to have any effect upon her weekly benefit amount or upon her total entitlement. As noted by the California court in *Tomlin v. California Unemployment Ins. Appeals*, 82 Cal. App. 3d 642, 147 Cal. Rptr. 403, 407 (1978): "If the claimant qualifies for full benefits in the absence of part time work, and for at least partial benefits when the claimant has part time work, then it makes no sense that should the optional part time work cease, for any reason, the claimant would become disqualified from any and all benefits." We do not believe that the act requires an all or nothing interpretation as urged by the commissioner.

The weekly benefit amount payable under Neb. Rev. Stat. § 48-624 (Cum. Supp. 1980) is determined by the "total wages paid to such individual for insured work, in that quarter, of his base period, in which such total wages were highest." While the claimant would not be disqualified under § 48-628(a) from all benefits by reason of quitting one of her multiple concurrent jobs, she would be disqualified for the relevant period from receiving those benefits attributed to the job which she quit. And under Neb. Rev. Stat. § 48-626 (Cum. Supp. 1980) "the total benefit amount based on the employment from which he or she was so separated shall be reduced by an amount equal to the number of weeks for which he or she is or would have been disqualified had he or she filed a claim immediately after the separation, multiplied by his or her weekly benefit amount . . . ." But "in no event shall the benefit amount based on employment for any employer be reduced to less than one benefit week where the individual was or could have been determined disqualified" because of a voluntary quit.

To so hold will not do injustice to anyone, including Merle's Food and Drink. It appears clear to us that under the provisions of Neb. Rev. Stat. § 48-652(3)(a) (Cum. Supp. 1980), Merle's Food and Drink would not have its experience account charged for any benefits, including a residual 1 week of benefits because of the disqualifying act of Gilbert. And Central Heating is explicitly charged "only for benefits based upon wages paid by such employer." In light of this mechanism for crediting and charging the experience accounts of different employers separately, it is entirely reasonable to interpret "benefits" under § 48-628(a) in such a way that benefits attributable to separate employers are disqualified separately. Also, the commissioner has within his power the ability to eliminate any perceived injustices to employers. Specifically, § 48-652(3)(a) provides: "The commissioner shall

by general rules prescribe the manner in which benefits shall be charged against the account of several employers for whom an individual performed employment during the same quarter."

We believe the more reasonable interpretation of § 48-628(a) is that where more than one job is held concurrently by an employee, a disqualifying termination of one job does not thereby automatically disqualify the employee from benefits based upon other jobs against which no disqualification applies. With regard to disqualification for benefits under § 48-628(a), each job should be considered separately and benefits disqualified separately according to the facts relating to the termination of each employment. If that is not what the Legislature intended in adopting § 48-628(a), it can say otherwise in the future. For these reasons the judgment of the trial court is affirmed.

AFFIRMED.