# IN THE SUPREME COURT OF IOWA

No. 15–0104

Filed June 3, 2016

Amended October 3, 2016

**SONDRA IRVING,**

Appellant,

vs.

**EMPLOYMENT APPEAL BOARD,**

Appellee.

_____

Appeal from the Iowa District Court for Linn County, Denver D. Dillard, Judge.

Claimant appeals district court judgment affirming denial of unemployment benefits for a job termination resulting from her incarceration. **REVERSED.**

Alisa Diehl of Iowa Legal Aid, Cedar Rapids, for appellant.

Rick Autry of Iowa Employment Appeal Board, Des Moines, for appellee.

**APPEL, Justice.**

In this case, an employee was terminated because of absence from work arising out of her incarceration on criminal charges unrelated to the work place. The employee filed for unemployment benefits. The Iowa Employment Appeal Board (EAB) denied the benefits on the grounds that her absence from the workplace was misconduct and should be regarded as a voluntary quit. The employee appealed. The district court affirmed. The employee then appealed to this court. For the reasons expressed below, we reverse.

## I. Background Facts and Proceedings.

Sondra Irving was employed as a medical assistant at the University of Iowa Hospitals and Clinics (UIHC). She was arrested on November 28, 2013, and incarcerated through December 24, but the charges were ultimately dismissed.

Irving was scheduled to resume work on December 3. At Irving's request, her mother called UIHC every work day between December 2 and December 11 to report that Irving would be absent from work. On December 11, an employee at UIHC told Irving's mother that she did not need to call anymore because Irving had been placed on a leave of absence. Irving's supervisors at UIHC visited her on December 5 and told her they were doing everything they could to make sure she did not lose her job. Irving's supervisors continued to visit on visiting days, and they told her that she had been placed on a leave of absence.

After she was released, Irving attempted to return to work and was told that she was no longer employed. Irving attempted to reapply for her job and was rejected. Irving applied for unemployment insurance benefits on January 16, 2014, under the Iowa Employment Security Law. *See* Iowa Code ch. 96 (2013). Iowa Workforce Development denied her

application in a letter stating, "Our records indicate you voluntarily quit work on 12/20/13, because you were arrested and confined in jail. Your quitting was not caused by your employer." Irving appealed the decision. The unemployment insurance appeal hearing was held before an administrative law judge.

At the hearing, a representative from UIHC testified that they considered Irving to have quit after failing to report to work for three consecutive days without proper notification and authorization. The representative said they knew she was incarcerated and received calls from Irving's mother but that any leave of absence required specific procedures and prior authorization, which Irving failed to follow or obtain. Further, the representative stated that they applied Irving's accrued vacation time to attempt to cover her absence, but her vacation was exhausted by December 3, 2013.

Irving attempted to introduce evidence about the charges against her and their dismissal at the time of the hearing, but evidence on that topic was rejected as not being relevant to her separation from UIHC. The administrative law judge rejected Irving's application for unemployment insurance benefits because Irving voluntarily quit without good cause attributable to her employer under Iowa Code section 96.5(1) and Iowa Administrative Code rule 871—24.25(16) (2013). The administrative law judge also noted that even if Irving had proved she did not voluntarily quit, the outcome would be the same because excessive unexcused absences due to incarceration qualify as misconduct.

Irving appealed to the EAB, arguing that she did not voluntarily quit and that her absenteeism was not the result of a matter of personal responsibility and thus did not constitute misconduct. She argued that she attempted to introduce evidence of her innocence of the charges for

which she was incarcerated, that this evidence was rejected by the administrative law judge, and that the rejection of the evidence was an error.

The EAB affirmed the administrative law judge, noting that a voluntary quit is based upon an employee's subjective intent but that "the reality of the incarceration and [the employee's] subjective hopes of keeping the job are at odds." It therefore found Irving to have voluntarily quit. The EAB also found that her absenteeism constituted misconduct because Irving's legal problems were an issue of personal responsibility. The EAB noted that it was accepting evidence of the dismissal of Irving's charges but not a letter she submitted which explained the reason for the dismissal. Finally, the EAB noted that Irving was separated from a second job the same week she was separated from UIHC—evidence about which was not presented before the administrative law judge nor described in EAB's decision—and explained that once Irving requalified for unemployment benefits, the disqualification would be lifted from both discharges. The EAB stated that this observation about Irving's second job played no role in its decision relating to her job at UIHC.

Irving appealed to the district court, which concluded that the EAB properly denied her unemployment compensation benefits on the basis of a voluntary quit resulting from her incarceration. The district court also said that the EAB could have properly found that Irving voluntarily quit because of excessive absences without proper notification or for misconduct because of excessive absences. The district court's decision was filed on December 18, 2014.

Irving filed a timely notice of appeal. On appeal, Irving asserts that her involuntary incarceration cannot be considered a voluntary quit or misconduct under Iowa unemployment insurance law. *See* Iowa Code

§ 96.5(1). The EAB defends its own decision and the district court on both these issues.

The EAB, however, raises a new issue not raised before the agency or the district court. For the first time on this appeal, the EAB notes that at the time of her incarceration, Irving had two jobs, one with UIHC, and a second job which was not mentioned in the record. The EAB states that Irving lost both jobs as a result of her incarceration. It asserts that Irving's disqualification for benefits as to the second job was based on discharge for misconduct arising out of her failure to report her arrest. It claims that in the matter of the second job, Irving lost before the agency and lost on appeal before the district court in an order entered February 18, 2015, approximately two months after the district court order denying her benefits associated with her discharge from UIHC. The EAB indicates that Irving failed to appeal the decision in the matter of the second job, however, and that as a result, the district court's determination that she was disqualified from receiving unemployment benefits in that case became final.

Now, on appeal of the case involving Irving's termination from UIHC, the EAB raises its new argument. The EAB argues that because Irving did not appeal the adverse decision in the matter of her second job, she is not qualified for benefits in connection with her termination from UIHC. The gist of the EAB's argument is that if an employee is disqualified from receiving unemployment benefits as a result of termination from concurrent part-time employment, the disqualification also applies with respect to eligibility for unemployment benefits from the loss of the other job, regardless of the nature of termination from that position. A shorthand description of this argument is the "spill-over" theory. *See Glende v. Comm'r of Econ. Sec.*, 345 N.W.2d 283, 285 (Minn.

Ct. App. 1984) (rejecting the notion that a " 'spill-over' taint of disqualification" requires blanket disqualification for all concurrent forms of employment). The EAB describes the spill-over argument as a claim that this action is moot.

The EAB recognizes this argument was not raised before the agency or the district court in the matter involving disqualification for unemployment benefits from UIHC. In anticipation of a preservation issue, the EAB frames its spill-over argument as a claim that Irving's current appeal has become moot. The EAB points to the timing of the decisions. The February 18, 2014 decision of the district court in the case of Irving's second job became final only after the district court entered its decision in the present case on December 18, 2014, with a notice of appeal filed on January 16, 2015.

In light of this interesting procedural posture, the EAB argues that Irving will be "disqualified on the same terms no matter how this appeal turns out." The EAB suggests, therefore, that in this appeal, Irving cannot show prejudice arising from the action of the EAB in her unemployment claim involving UIHC as required by the Iowa Administrative Procedure Act. Iowa Code § 17A.19(8)(*a*).

In reply to the EAB's new argument, Irving does not raise preservation issues. Instead, she attacks the EAB's position on the merits. She claims that her disqualification based on alleged misconduct from her part-time job should have no bearing on whether she should be disqualified from receiving unemployment benefits as to her full-time job. In the alternative, Irving argues that even if the EAB is correct that this action is moot on a spill-over theory, this court should nonetheless address the important substantive issues presented in this appeal.

## II. Scope of Review.

"Our review of unemployment benefit cases is governed by the [Iowa] Administrative Procedure Act, Iowa Code chapter 17A." *Dico, Inc. v. Iowa Emp't Appeal Bd.*, 576 N.W.2d 352, 354 (1998). We elaborated on our standard of review in *Hawkeye Land Company v. Iowa Utilities Board*:

> Iowa Code section 17A.19(10) governs judicial review of an agency ruling. The district court reviews the agency's decision in an appellate capacity. In turn, "[w]e review the district court's decision to determine whether it correctly applied the law." "We must apply the standards set forth in section 17A.19(10) and determine whether our application of those standards produce[s] the same result as reached by the district court." "The burden of demonstrating the . . . invalidity of agency action is on the party asserting invalidity."

847 N.W.2d 199, 207 (Iowa 2014) (alterations in original) (first quoting *Iowa Med. Soc'y v. Iowa Bd. of Nursing*, 831 N.W.2d 826, 838 (Iowa 2013); then quoting *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004); and then quoting Iowa Code § 17A.19(8)(*a*)).

## III. Preliminary Issue: *Renda* Deference.

As a preliminary question, before we consider any of the legal issues in this case, we must determine whether the EAB is entitled to deference in its legal interpretations in this case. There are at least three potential legal issues under Iowa Code section 96.5. The first issue is whether, as a matter of law, Irving's incarceration disqualified her from receiving benefits under the voluntary-quit provision of the statute and related rules concerning absenteeism. The second legal question is whether Irving's incarceration disqualified her from receiving benefits because it amounted to misconduct under the statute and accompanying administrative rules. The third legal issue, if it is properly before us, is whether Irving's failure to appeal her disqualification for misconduct in

the matter of her part-time job requires her disqualification from receiving benefits in this matter under Iowa Code section 96.5(2).

The recent seminal case regarding the degree to which this court defers to legal interpretations of an administrative agency is *Renda v. Iowa Civil Rights Commission*, 784 N.W.2d 8, 10–15 (Iowa 2010). In *Renda*, we concluded that we should not afford deference to an agency's legal interpretations unless that interpretive authority has clearly been vested in the agency. *Id.* at 11. Where there is no express grant of interpretive authority, we as a general matter do not grant deference to an agency when the legal terms being construed have independent legal meaning not within its expertise. *Id.* at 14. Words and phrases like "voluntary," "misconduct," "employer," and "in connection with" are not alien to the legal lexicon. These terms are not complex or beyond the competency of courts. *See SZ Enters., LLC v. Iowa Utils. Bd.*, 850 N.W.2d 441, 451 (Iowa 2014) (declining to defer to agency interpretation when the subject matter is not overtly complex and concerns "terms that do not on their face appear to be technical in nature"); *see also Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 558 (Iowa 2010). Like the district court, we discern no clear indication in the statute requiring *Renda* deference and conclude that we do not defer to the agency's interpretation of law.

**IV. Dismissal for Misconduct and Disqualification for Unemployment Insurance Benefits from All Other Concurrent Employers—The Spill-Over Theory.**

**A. Procedural Posture.** At the outset, we must confront a somewhat unusual procedural issue. As indicated above, the question of whether disqualification for misconduct related to concurrent, part-time employment inexorably leads to disqualification for benefits related to a

different full-time job with a different employer under a spill-over theory was not presented to the agency or the district court and is raised for the first time on appeal. The disqualification for misconduct related to Irving's part-time job did not become final until after the district court ruled in this case and Irving filed her notice of appeal.

We have repeatedly said in the context of unemployment appeals that we consider only issues raised in the record before the EAB. *Bartelt v. Emp't Appeal Bd.*, 494 N.W.2d 684, 687 (Iowa 1993) ("Disqualification for benefits stand[s] or fall[s] on the ground asserted before the agency."); *Sharp v. Emp't Appeal Bd.*, 479 N.W.2d 280, 284 (Iowa 1991) (finding termination for misconduct not raised before the agency and thus "there is nothing to review"); *Roberts v. Iowa Dep't of Job Serv.*, 356 N.W.2d 218, 223 (Iowa 1984) (holding that upon judicial review, the district court reviews final agency action and that "[i]n the absence of the requisite agency finding, we have nothing to review"). It is undisputed that the issue of whether disqualification from a part-time job means disqualification for benefits from a simultaneously held full-time job was not considered by the EAB and was not part of the appeal to the district court. Under our precedent, there is a real question whether we can reach out and decide a new issue presented on appeal for the first time. *See Bartelt*, 494 N.W.2d at 687; *Sharp*, 479 N.W.2d at 284; *Roberts*, 356 N.W.2d at 223.

There might be some room to consider the issue under the principles discussed in the concurring and dissenting opinion in *Feld v. Borkowski*, 790 N.W.2d 72, 84–85 (Iowa 2010) (Appel, J., concurring in part and dissenting in part) (discussing when matters not raised by the parties may properly be considered before the court). The *Feld* majority does not explain, however, how to avoid the *Bartelt, Sharp,* and *Roberts*

precedents in order to reach the underlying issue. Finding an exception to our precedents might be problematic in the context of an appeal of final agency action under the Iowa Administrative Procedures Act. Such an appeal implies a ruling by the agency, not an argument made by counsel on appeal. It is true, of course, that a challenger to agency action must generally show prejudice. Iowa Code § 17A.19(8)(*a*). But can lack of prejudice be shown by reference to facts and arguments outside the administrative record?

The procedural snarl presented in this case also has implications for the underlying merits of the late-raised issue. Even assuming some spill-over effect, there is a question of timing. Does a disqualification for misconduct in a part-time job operate to disqualify a claimant from benefits after a hearing has been held on the merits with respect to benefits resulting from loss of the simultaneously held full-time job? The procedural posture in the current case suggests that even if there is a concept of vicarious disqualification across jobs, the application of such a rule should relate to terminations which occur only *after* the finding of misconduct has become final. Otherwise, retroactive misconduct disqualification amounts to a penalty or forfeiture of unemployment benefits where the entitlement to benefits has already been determined. *See Richards v. Unemployment Comp. Bd. of Review*, 480 A.2d 1338, 1340 (Pa. Commw. Ct. 1984) (finding "no statutory or other basis for imposing a penalty" on a claimant's previously determined compensation from his full-time employer after his discharge for misconduct from a part-time employer); *see also Faatz v. Unemployment Comp. Bd. of Review*, No. 377 C.D. 2015, 2015 WL 5511319, at *2 & n.3 (Pa. Commw. Ct. Aug. 11, 2015) (noting that the claimant's misconduct

discharge from her part-time job would not affect any previously determined benefits, if she had any).

The EAB suggests that we can consider the issue on appeal even though the question has not been presented to the district court or to the agency because mootness may be raised at any time. Mootness, however, generally applies where there is a lack of a real live controversy which deprives the court of the ability to provide the parties with a remedy. Here, there is a real live controversy which plainly has not been extinguished. The problem does not seem like a mootness issue, but rather a collateral attack based on a new issue.

The procedural questions are complicated. Instead of sorting through these complex issues, we turn to the underlying merits to resolve the issue which has been presented to us and briefed by the parties.

**B. Overview of Spill-Over Disqualification.** The EAB asks us to hold that a final disqualification for misconduct in a claimant's part-time employment leads to disqualification of the employee for unemployment insurance resulting from her termination from her simultaneously held full-time job regardless (1) of the reasons for termination from the full-time job and (2) even though the final determination of disqualification for misconduct on the part-time job occurred after termination from the full-time job and was not advanced as a reason for disqualification of benefits related to the claimant's full-time job in proceedings before the EAB.

We have not had occasion to consider these questions before. To do so, we must balance two competing interests. On the one hand, we have the interest of the person who loses both jobs in this way—the remedial benefits of unemployment insurance can accomplish much to

alleviate the misery of a period of unemployment.  On the other hand, we have the interests of the health of the employment insurance fund, all other people who may draw from the fund, and the employers who contribute to the fund; allowing those who become unemployed due to their own fault under the law to draw from the fund would deplete the fund at the expense of those who were not at fault and would defeat one of the goals of the law, namely to provide financial incentives to employers to refrain from terminating employees for disapproved reasons.  *See* Iowa Code § 96.2 (stating that reducing unemployment can be accomplished by "encouraging employers to provide more stable employment"); Katherine Baicker, Claudia Goldin & Lawrence F. Katz, *A Distinctive System: Origins and Impact of U.S. Unemployment Compensation*, *in The Defining Moment: The Great Depression and the American Economy in the Twentieth Century* 227, 245–50 (Michael D. Bordo, Claudia Goldin, & Eugene N. White eds., 1998), http://nber.org/chapters/c6895 (describing how penalizing employers for benefits paid to their workers was intended to reduce unemployment by giving financial incentives to employers to provide stable, as opposed to seasonal, employment).

**C.  Iowa Statutory Provisions Related to Misconduct.**  The key Iowa statutory provision involved in this issue is Iowa Code section 96.5(2).  It provides,

> If the department finds that the individual has been discharged for misconduct *in connection with the individual's employment*:
>
> *a.*  The individual shall be disqualified for benefits until the individual has worked in and has been paid wages for insured work equal to ten times the individual's weekly benefit amount, provided the individual is otherwise eligible.

*b.* Provided further, if gross misconduct is established, the department shall cancel the individual's wage credits earned, prior to the date of discharge, *from all employers.*

*c.* Gross misconduct is deemed to have occurred after a claimant loses employment as a result of an act constituting an indictable offense in connection with the claimant's employment, provided the claimant is duly convicted thereof or has signed a statement admitting the commission of such an act.

*Id.* (emphasis added).

The emphasized portions of the statute show that the legislature referred to misconduct "in connection with the individual's employment" and gross misconduct that cancelled an individual's wage credits "from all employers."

In addition, the EAB has an administrative rule fleshing out the content of "misconduct" under the Iowa Employment Security Law. Iowa Admin. Code r. 871—24.32(1)(*a*). The rule includes within "misconduct" acts or omissions "arising out of such worker's contract of employment"; limits misconduct to acts evincing willful or wanton disregard of "an employer's interest"; and includes carelessness or negligence only when it is of such a degree of recurrence as to show intentional and substantial disregard "of the employer's interests" or of the employee's duties and obligations "to the employer." *Id.* Under the administrative rules, excessive unexcused absence is considered misconduct except for illness or "other reasonable grounds." *Id.* r. 871—24.32(7).

**D. Positions of the Parties.** The EAB's position is that Irving's discharge for misconduct from her part-time job serves to disqualify her from receiving unemployment insurance benefits from her full-time job at UIHC. The EAB cites Iowa Code section 96.5(2), which states, "If the department finds that the individual has been discharged for misconduct in connection with the individual's employment[,] . . . [t]he individual

shall be disqualified for benefits . . . ." Nothing in this provision, the EAB argues, limits the disqualification to the job for which the individual was discharged for misconduct. Since the disqualification for benefits is not limited in the statute to one employer, it must be applied to *all* benefits from *all* employers. The EAB states that this rule of "complete disqualification" has been applied for thirty-six years and is a key component of the entire system of administration of the unemployment compensation fund.

Irving disagrees with the EAB's position. She analogizes the issues of misconduct and complete disqualification to prior Iowa caselaw on voluntary quits, wherein the court of appeals held that a voluntary quit from a part-time employer did not disqualify the individual from benefits from a full-time employer. *Welch v. Iowa Dep't of Emp't Servs.*, 421 N.W.2d 150, 154 (Iowa Ct. App. 1988).

**E. Authority from Other States Regarding Spill-Over for Misconduct.** The Iowa Employment Security Law (the Act) was enacted as part of a national movement arising out of the Great Depression to provide a measure of financial security to those who were involuntarily unemployed. All states have enacted such statutes. While the statutes are not identical in all respects, they are sufficiently similar that this court has often relied on cases from other jurisdictions to aid in the interpretation of Iowa law. *See, e.g.*, *Harlan v. Iowa Dep't of Job Serv.*, 350 N.W.2d 192, 194 (Iowa 1984); *Higgins v. Iowa Dep't of Job Serv.*, 350 N.W.2d 187, 191–92 (Iowa 1984); *Cosper v. Iowa Dep't of Job Serv.*, 321 N.W.2d 6, 10–11 (Iowa 1982); *Huntoon v. Iowa Dep't of Job Serv.*, 275 N.W.2d 445, 448 (Iowa 1979).

We have found caselaw in four states considering whether a misconduct discharge with respect to one employer disqualifies an

individual from receiving unemployment benefits for other employers. In each of these states, appellate courts have overturned agency determinations that disqualification from benefits from one job necessarily means disqualification of benefits from another job.

We begin with caselaw from Pennsylvania. In *Richards*, the Commonwealth Court of Pennsylvania considered a case where an employee was laid off from a factory job. 480 A.2d at 1339. After the layoff, the claimant obtained a part-time job at Domino's Pizza. *Id.* Because of the low wages at Domino's, he continued to receive unemployment benefits from the factory. *Id.* The claimant was then fired from Domino's for willful misconduct. *Id.* The question was whether the termination from Domino's for misconduct provided a basis for disqualification from continued benefits from the factory job. *Id.* The administrative agency denied continued benefits arising from the claimant's factory job. *Id.*

The *Richards* court disagreed, holding that the employee's loss of employment with Domino's was irrelevant to his unemployment benefits from his full-time job. *Id.* The court held there was no difference between a voluntary quit and a misconduct discharge for the purposes of determining whether the employee should be disqualified for benefits from other jobs. *Id.* The *Richards* court held,

> [W]e have no statutory or other basis for imposing a penalty as to regular benefits because of unemployment from a part-time job which Claimant had a right to keep or lose since the earnings therein could in no respect affect his entitlement to regular benefits.

*Id.* at 1340.

Similar caselaw appears in Minnesota. In *Glende*, an employee was simultaneously employed by a full-time employer and a part-time

employer. 345 N.W.2d at 284. The employee was terminated for misconduct from the part-time job and was laid off from his full-time job a few days later. *Id.* The *Glende* court drew an analogy from cases involving voluntary quits, wherein the Minnesota Supreme Court held that a voluntary quit from a part-time job could not be a basis for disqualification for benefits of another job. *Id.* at 284; *see Berzac v. Marsden Bldg. Maint. Co.*, 311 N.W.2d 873, 875 (Minn. 1981). Despite the agency's mandate to "examine . . . separate claim petitions upon their individual merits," *Berzac*, 311 N.W.2d at 875, the administrative agency in *Glende* disqualified the employee for benefits from his full-time job based on his misconduct termination in his part-time employment. *Glende*, 345 N.W.2d at 284.

The *Glende* court reversed. *Glende*, 345 N.W.2d at 285. The court noted that the agency ignored its prior instruction from *Berzac* and "repeated its erroneous practice of denying benefits from the full-time employment by virtue of a 'spill-over' taint of disqualification from the previous part-time employment." *Id.*

The approach of the *Glende* court was approved by the Minnesota Supreme Court in *Sticka v. Holiday Village South*, 348 N.W.2d 761, 763 (Minn. 1984). The *Sticka* court declared that the "all or nothing proposition" of the Minnesota agency was "misguided." *Id.* Although the case involved a voluntary quit of a part-time job, the *Sticka* court declared that "it makes no sense that on cessation of the part-time work *for any reason*, [the employee] should become disqualified for any and all benefits." *Id.* (emphasis added).

In support of its approach, the *Sticka* court cited a Nebraska case, *Gilbert v. Hanlon*, 335 N.W.2d 548, 553 (Neb. 1983). Like *Sticka*, the case involved a situation where the employee voluntarily quit a part-time

job. *Id.* at 550. The *Gilbert* court, however, broadly stated that where more than one job is held concurrently by an employee, "a disqualifying termination of one job does not thereby automatically disqualify the employee from benefits based upon other jobs against which no disqualification applies." *Id.* at 553. According to the *Gilbert* court, "each job should be considered separately and benefits disqualified separately according to the facts relating to the termination of each employment." *Id.*

Finally, in *Brooks v. Department of Labor & Industrial Relations*, the Hawaii Supreme Court considered whether an employee with simultaneous full-time and part-time jobs and who was discharged for misconduct from his part-time job was not eligible for unemployment compensation from the full-time job when he was discharged from that job for medical reasons. 704 P.2d 881, 881 (Haw. 1985). The employee was denied benefits from his full-time job at the administrative stage because of the earlier misconduct termination. *Id.* at 882. The court disagreed, stating that the employee was not unemployed at the time he was discharged from his full-time job for medical reasons despite being previously discharged for misconduct from his other job. *Id.* at 882.

Obviously, these cases are not binding authority in Iowa. They do show, however, that when the relatively rare spill-over issue has been presented elsewhere, the state appellate courts have liberally construed their employment security acts and found in favor of the employee.

**F. Iowa Authority on Nexus and Spill-Over.** There is no Iowa authority directly on point regarding the issue of the spill-over effect of a disqualification for benefits resulting from discharge from a part-time job for misconduct. Generally, however, we have held that "each individual case under the unemployment compensation statute must be considered

and construed upon the facts as presented." *Moorman Mfg. Co. v. Iowa Unemployment Comp. Comm'n,* 230 Iowa 123, 130–31, 296 N.W. 791, 795 (1941).

Additionally, our courts have heard several cases concerning whether an employee discharged for voluntarily quitting a part-time job is then barred from receiving unemployment benefits from a full-time job. In *McCarthy v. Iowa Employment Security Commission,* we considered a case where an employee quit a second, part-time job, before being laid off from a full-time job. 247 Iowa 760, 762, 76 N.W.2d 201, 202 (1956). When he applied for unemployment benefits from his full-time job, the administrative agency found him disqualified because of his previous voluntary quit. *Id.* at 762–63, 76 N.W.2d at 203. We disagreed, reasoning that the Employment Security Law requires employers to pay into the unemployment fund for their employees and that the only interest an employer has is in the amount they contributed to the fund for that employee. *Id.* at 763, 76 N.W.2d at 203. We stated, "[T]he termination of the plaintiff's work with the [part-time employer] should have no effect upon the [payment] record of his full-time employer." *Id.* We found that fact important in construing the meaning of the phrase "his work" in Iowa Code section 96.5(1) (1954), noting that the subsection does not say "*all* his work." *Id.* at 764–65, 76 N.W.2d at 203–04. In other words, the "work" referred to in section 96.5(1) is in relation to the employer with the financial interest in that portion of the employment fund. Importantly, we were unwilling to write in the term "all" to precede the term "work" in the statute.

In *Welch v. Iowa Department of Employment Services,* the court of appeals heard a similar case where an employee left part-time employment and had trouble securing unemployment compensation for a

full-time job. 421 N.W.2d 150, 151 (Iowa Ct. App. 1988). The court of appeals noted that if the full-time employer did not have to pay unemployment benefits due to the separation from the part-time employer, that this would result in a "windfall . . . to the regular employer who did cause claimant's unemployment because of that employer's being relieved of liability." *Id.* at 153.

### G. Analysis.

1. *Principles of statutory construction.* We begin with a brief review of the general principles of statutory construction and the specific rules of construction that relate to cases under the Iowa Employment Security Law.

We have stated that the guiding polestar of statutory analysis is to determine and apply the intent of the legislature. *Iowa Dep't of Revenue v. Iowa Merit Emp't Comm'n,* 243 N.W.2d 610, 614 (Iowa 1976). If the words of a statute are "so clear and free from obscurity that [their] meaning is evident from a mere reading," that is the end of the matter. *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (Iowa 1995) (quoting *Kruck v. Needles*, 259 Iowa 470, 476, 144 N.W.2d 296, 300 (1966)). If a statute is ambiguous, we will then construe the statute using traditional tools of statutory interpretation. *See generally* Iowa Code § 4.6 (2013) (outlining various factors that may be considered in determining legislative intent).

We have cautioned, however, against overbroad use of the plain-meaning doctrine. We have stated that courts "should be circumspect regarding narrow claims of plain meaning and must strive to make sense of [a statute] as a whole." *Rolfe State Bank v. Gunderson*, 794 N.W.2d 561, 564 (Iowa 2011). Ambiguity may arise not only from the meaning of particular words, but also "from the general scope and meaning of a

statute when all its provisions are examined." *Id.* (quoting *Holiday Inns Franchising*, 537 N.W.2d at 728).

Consistent with our caselaw, the leading treatise on statutory construction cautions against indiscriminate use of the plain meaning approach, noting that "invocation of the plain meaning rule may represent an attempt to reinforce confidence in an interpretation arrived at on other grounds." *See* 2A Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction*, § 46:1 (7th ed., rev. vol. 2014). The treatise further notes that "it would seem difficult, or impossible, for courts to determine the meaning of a statutory term or provision without any contextual consideration." *Id.* § 46.4, at 199–200.

We have applied these general principles in the context of the Iowa Employment Security Law. For instance, in *McCarthy*, we cautioned that language that is "plain and unambiguous" in some contexts might not be so in another. 247 Iowa at 762, 76 N.W.2d at 202. Citing prior precedent, we emphasized, "Doubtless the language must be construed in the light both of its context and its purpose." *Id.* (citing *Stromberg Hatchery v. Iowa Emp't Sec. Comm'n*, 239 Iowa 1047, 1054, 33 N.W.2d 498, 503 (1948)).

In construing statutes, we often look to the underlying legislative purpose. *See Holiday Inns Franchising*, 537 N.W.2d at 728. Particularly relevant in determining that purpose is a statute's preamble or statement of policy. *See id.*; *DeMore ex rel. DeMore v. Dieters*, 334 N.W.2d 734, 737 (Iowa 1983). Here, the legislature has provided us with a lengthy statement of the legislative policy underlying the statute. Iowa Code section 96.2 provides,

> Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject

of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and the worker's family. . . . The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure . . . for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

We have characterized the legislative purpose as including a goal of "minimizing the burden of involuntary unemployment" and have cited that purpose in numerous cases interpreting the statute. *See Roberts*, 356 N.W.2d at 221; *see also, e.g., Bridgestone/Firestone, Inc. v. Emp't Appeal Bd.*, 570 N.W.2d 85, 96 (Iowa 1997); *Cosper*, 321 N.W.2d at 10.

We also look to the entire statute in construing a particular provision or section. When we interpret a statute, "we assess the statute in its entirety, not just isolated words or phrases." *In re Estate of Bockwoldt*, 814 N.W.2d 215, 223 (Iowa 2012) (quoting *Doe v. Iowa Dep't of Human Servs.*, 786 N.W.2d 853, 858 (Iowa 2010)); *accord In re A.J.M.*, 847 N.W.2d 601, 605 (Iowa 2014); *State v. Romer*, 832 N.W.2d 169, 177 (Iowa 2013); *State v. Young*, 686 N.W.2d 182, 184–85 (Iowa 2004); *City of Nevada v. Slemmons*, 244 Iowa 1068, 1071, 59 N.W.2d 793, 794 (1953). The concept of considering the entire act and construing its various provisions in that light is well established in our caselaw involving the Iowa Employment Security Law. *See McCarthy*, 247 Iowa at 762, 76 N.W.2d at 202; *Merchants Supply Co. v. Iowa Emp't Sec. Comm'n*, 235 Iowa 372, 381, 16 N.W.2d 572, 578 (1944); *Iowa Public Serv. Co. v. Rhode*, 230 Iowa 751, 753, 298 N.W. 794, 796 (1941).

In addition to the statement of purpose and the general rules of statutory construction, there are some specific rules that apply to cases under the Iowa Employment Security Law that have a bearing on our

consideration of the statutory issues presented in this case. For instance, we have stated that in light of the salutary purposes of the Act, we construe its provisions "liberally to carry out its humane and beneficial purpose." *Bridgestone/Firestone*, 570 N.W.2d at 96; *see also Roberts*, 356 N.W.2d at 221; *Brumley v. Iowa Dep't of Job Serv.*, 292 N.W.2d 126, 129 (Iowa 1980); *Smith v. Iowa Emp't Sec. Comm'n*, 212 N.W.2d 471, 472–73 (Iowa 1973). The notion that the Iowa Employment Security Law is to be liberally construed to carry out its humane and beneficial purpose is not an arithmetic rule of certain application, but it does mean that in close cases the benefit of the doubt is in favor of extending benefits to fulfill the purpose of the Act.

We have said that the claimant has the burden to initially show qualification for benefits. *See Moulton v. Iowa Emp't Sec. Comm'n*, 239 Iowa 1161, 1172, 34 N.W.2d 211, 217 (1948). Under the statute, however, the employer generally has the burden to show disqualification. Iowa Code § 96.6(2); *see Reigelsberger v. Emp't Appeal Bd.*, 500 N.W.2d 64, 66 (Iowa 1993); *Bartelt*, 494 N.W.2d at 686. Further, we and our court of appeals have recognized the parallel concept that disqualification provisions of the statute are subject to narrow or strict construction in light of the beneficial purposes of the statute. *Bridgestone/Firestone*, 570 N.W.2d at 96; *Diggs v. Emp't Appeal Bd.*, 478 N.W.2d 432, 434 (Iowa Ct. App. 1991); *see also Marzetti Frozen Pasta, Inc. v. Emp't Appeal Bd.*, No. 08–0288, 2008 WL 4725151, at *3 (Iowa Ct. App. Oct. 29, 2008).

2. *Application of principles to the spill-over theory.* The statutory language is at least ambiguous on the question of whether a disqualification for misconduct from one employer means a disqualification for all employers. *See* Iowa Code § 96.5(2). Nothing in this Code provision expressly indicates whether a disqualification for

misconduct from one employer means disqualification from benefits from any other employer. In considering the issue, we must keep in mind the beneficial purposes of the Act, our precedent that the employer has the burden of proof regarding misconduct, and our precedent that the disqualification provisions of the Act are to be strictly construed against the employer. *Bridgestone/Firestone*, 570 N.W.2d at 96; *Reigelsberger,* 500 N.W.2d at 66.

Examination of the statute suggests that the disqualification for misconduct should apply only to the employment where the misconduct occurred. The introductory language of Iowa Code section 96.5(2) states that disqualification for misconduct must be "in connection with the individual's employment." This statutory language suggests that there must be a causal connection between the misconduct and the employment. *See State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 525–27 (Iowa 2005) (citing cases for the proposition that in the absence of a legislative definition, the phrase "in connection with" is commonly defined as "related to, linked to, or associated with").

There is, however, no nexus between a disqualification for misconduct from one employer and an employee's other job on which the misconduct has no bearing. To impose a spill-over or vicarious disqualification to a loss of employment with a full-time employer based on misconduct in connection with a part-time employer ignores the legislature's required nexus and seems more akin to imposition of a penalty or moral judgment than interpretation of the statute. But unemployment benefits are not paid primarily to reward or punish the employer or employee; they are instead intended to protect the stability of the state and the family. *See Nat'l Gypsum Co. v. Adm'r, La. Dep't of*

*Emp't Sec.*, 313 So. 2d 230, 232 (La. 1975); *Turner v. Brown*, 134 So. 2d 384, 386 (La. Ct. App. 1961); *cf. Richards*, 480 A.2d at 1340.

The language in the administrative rule related to misconduct appears to recognize the concept of a nexus with a specific employer. The rule defines misconduct as a deliberate act or omission arising "out of such worker's contract of employment." Iowa Admin. Code r. 871—24.32(1)(*a*). Where there are two employers, of course, there are two separate contracts of employment. But the rule seems to link the misconduct to a contract.

Further, the rule refers to "willful or wanton disregard of *an employer's interest*," deliberate disregard of the "standards of behavior which *the employer* has the right to expect," "intentional and substantial disregard of *the employer's* interest," and the "duties and obligations to *the employer.*" *Id.* (emphasis added). Such language in the administrative rule may not be determinative, but it tends to reinforce the common sense notion that misconduct is an employer specific concept.

Further, the statute demonstrates that the legislature knew how to use language that covers "all employers." Section 96.5(2)(*b*) provides that "if gross misconduct is established, the department shall cancel the individual's wage credits earned, prior to the date of discharge, *from all employers.*" Iowa Code § 96.5 (2)(*b*) (emphasis added). While the legislature used such language in subsection (2), paragraph (*b*), it did not use similar language in the adjacent paragraph (*a*). We should recognize the difference in adjacent statutory provisions, not ignore it. *See Alli v. Decker,* 650 F.3d 1007, 1016 (3rd Cir. 2011) (noting overreliance on dictionaries "to the exclusion of sources such as adjacent statutory provisions" can lead courts astray); *Davine v. Kapasi,* 729 F. Supp. 2d

1024, 1027–28 (N.D. Ill. 2010) (noting difference between adjacent statutory provisions); *Bray v. Tejas Toyota, Inc.*, 363 S.W.3d 777, 785 (Tex. App. 2012) (noting importance of difference in adjacent statutory language).

There is good reason for the adjacent statutory distinction between misconduct and gross misconduct. An employee who commits misconduct with one employer may be performing satisfactorily with another employer. As noted by an academic commentary, "Identical conduct might be treated as [misconduct] in one environment and not in another. One plant will have established rules for employee conduct which will not exist at another work location." Paul H. Sanders, *Disqualification for Unemployment Insurance*, 8 Vand. L. Rev. 307, 335 (1955).

The Iowa case *Cook v. Iowa Department of Job Service* illustrates the fact that misconduct with respect to one employer may not necessarily be misconduct toward another. 299 N.W.2d 698, 702 (Iowa 1980). In *Cook*, the claimant was employed in a position that required a driver's license in order to deliver groceries. *Id.* at 699. The claimant received numerous speeding citations. *Id.* Ultimately, the employer received notice from its insurance carrier that it would no longer cover the claimant due to his poor driving record. *Id.* at 700. Not having other suitable positions for the claimant, the employer terminated him. *Id.* We held that since the claimant's predicament was a result of "self-inflicted uninsurability," such conduct amounted to disqualifying misconduct. *Id.* at 702.

Yet suppose the claimant in *Cook* was disqualified from a part-time pizza delivery job when he concurrently held a full-time highly skilled job that did not require a driver's license. Assume further that the claimant

had a spotless employment record in the full-time position. Under this scenario, it does not make sense to automatically disqualify the employee should he or she become unemployed from the full-time job under some kind of spill-over theory.

A different scenario arises, however, when disqualification results from gross misconduct. Gross misconduct involves very serious offenses that would lead any employer to question the desirability of ongoing employment regardless of whether the conviction was in connection with the worker's employment. To provide a harsher treatment of gross misconduct compared to ordinary misconduct is certainly a rational legislative policy. *See, e.g.*, *Johnson v. So Others Might Eat, Inc.*, 53 A.3d 323, 326–27 (D.C. 2012) (noting different consequences for gross misconduct and misconduct). And it is consistent with the legislative language canceling wage credits earned "from all employers." Iowa Code § 96.5(2)(*b*).

We further think the reasoning of *McCarthy* and *Welch* is instructive. Section 96.5(1) dealing with voluntary quits and section 96.5(2) dealing with misconduct use slightly different language to refer to the individual's job—"left work voluntarily" versus "discharged for misconduct in connection with the individual's employment." Iowa Code § 96.5(1), (2). Yet in *McCarthy*, we refused to judicially add the term "all" before the term "work." 76 N.W.2d at 203–04. We decline to add the term "all" here as well, particularly when the legislature in fact used a more inclusive term "all employers" in the subsection immediately following the statutory provision in question here. This plain vanilla, button-down approach to statutory interpretation is also consistent with our nexus approach in *Moorman Manufacturing*, where we required that each individual case of unemployment compensation be considered and

construed on the facts as presented. 230 Iowa at 130–31, 296 N.W. at 795.

Additionally, the purpose of financially penalizing employers for discharging employees for unapproved reasons is to encourage those employers to keep employees. That purpose would be negated by giving an employer a windfall as described in *Welch.* 421 N.W.2d at 153. Here, if an employer discharges a full-time employee without a voluntary quit or misconduct, the employer would get the kind of windfall we rejected in *Welch.*

Finally, we find the cases in other states of at least some value. *See Brooks*, 704 P.2d at 882; *Glende*, 345 N.W.2d at 285; *Richards*, 480 A.2d at 1340. These cases are somewhat conclusory, but they demonstrate that whatever else might be said, there is at least a solid basis in the caselaw to limit the effects of a discharge for misconduct to eligibility for unemployment insurance arising out of that employment. Our Iowa law directs us to narrowly consider provisions for disqualification for benefits. *Bridgestone/Firestone*, 570 N.W.2d at 96. We must do so in this case.

**H. Conclusion.** Because of the liberal purposes of the Act, the requirement that we narrowly construe provisions related to disqualification, the actual language of the Act and its implementing regulations, our past precedents, and the persuasive precedents from other states, we hold that Irving's challenge to her denial of unemployment benefits from UIHC should not be barred by the unappealed determination that she was terminated for misconduct from her part-time job. We conclude that the contention of the EAB is in violation of Iowa Code section 96.5(2) and the implementing regulations found in Iowa Administrative Code rule 871—24.32(1)(*a*). As a result,

the agency position is a violation of law contrary to Iowa Code section 17A.19(10)(*b*).

**V. Excessive Absence as a Result of Incarceration as Disqualifying Misconduct.**

**A. Introduction.** This case presents the question of whether Irving's absence from work as a result of incarceration is misconduct that disqualifies her from receiving unemployment benefits. The issue is not the distinctly different question of whether Irving may be lawfully terminated from employment for excessive absenteeism, but only whether under the facts and circumstances of this case, Irving is not entitled to receive unemployment benefits after such termination under the Iowa Employment Security Law. *See Brown v. Iowa Dep't of Job Serv.*, 367 N.W.2d 305, 306 (Iowa Ct. App. 1985); *Newman v. Iowa Dep't of Job Serv.*, 351 N.W.2d 806, 808 (Iowa Ct. App. 1984).

The standard an employer must meet to sustain disqualification for unemployment benefits is more demanding than the standard ordinarily required to support a termination of employment for just cause. In the context of disqualification for unemployment benefits based on misconduct, the question is whether the employee engaged in a "deliberate act or omission," conduct "evincing such willful or wanton disregard of an employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of employees," or conduct with "carelessness or negligence of such degree of recurrence as to manifest equal culpability." *See* Iowa Admin. Code r. 871—24.32(1)(*a*). In a wrongful termination context, the plaintiff ordinarily must show a lack of a "legitimate business reason" for the separation, a much different standard. *Rivera v. Woodward Resource Ctr.*, 865 N.W.2d 887, 898–99 (Iowa 2015). The apples of disqualification

for unemployment benefits should not be conflated with the oranges of just-cause terminations.

**B. Applicable Iowa Rules and Statutes Regarding Misconduct and Absenteeism.** The Iowa Employment Security Law statute states that "if the department finds that the individual has been discharged for misconduct in connection with the individual's employment," the individual may be disqualified from receiving unemployment benefits. Iowa Code § 96.5(2). The statute does not provide a definition of misconduct.

Iowa Code section 96.6(2) also has provisions related to the allocation of the burden of proof. The statute provides that generally the employer has the burden of proving that the claimant is disqualified from benefits. *Id.* § 96.2(2). There are no exceptions in the statute for shifting the burden of proof related to misconduct.

The rules promulgated by the EAB, however, do include a definition of misconduct. A full understanding of the elaborate and detailed definition of misconduct is essential to successfully navigating a dispute regarding disqualification for unemployment benefits on that basis. Misconduct is defined as

> a deliberate act or omission by a worker which constitutes a material breach of the duties and obligations arising out of such worker's contract of employment. Misconduct as the term is used in the disqualification provision as being limited to conduct evincing such willful or wanton disregard of an employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of employees, or in carelessness or negligence of such degree of recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in

judgment or discretion are not to be deemed misconduct within the meaning of the statute.

Iowa Admin. Code r. 871—24.32(1)(*a*).

The rule also contains language related to unexcused absenteeism:

Excessive unexcused absenteeism is an intentional disregard of the duty owed by the claimant to the employer and shall be considered misconduct except for illness or other reasonable grounds for which the employee was absent and that were properly reported to the employer.

*Id.* r. 871—24.32(7).

**C. Positions of the Parties.** The EAB notes that under Iowa Code section 17A.19(7), the role of this court is appellate in nature. The EAB cites the agency rule related to absenteeism stating that "excessive unexcused absences is an intentional disregard of the duty owed by the claimant to the employer." *Id.* According to the EAB, the evidence at the hearing showed the claimant was in jail for nearly a month and missed at least sixteen consecutive days of work in a single month. It claims that her incarceration amounted to "absenteeism arising from matters of purely personal responsibilities" and that the absences are thus not excused. *See Harlan,* 350 N.W.2d at 194. The EAB recognizes that the claimant asserted she was unable to make bail. The EAB sees the claimant's failure to make bail as simply a matter of personal responsibility that does not affect her obligation to arrive at work.

Irving responds that she is not disqualified from benefits due to misconduct. She emphasizes our caselaw states that "misconduct connotes volition." *Huntoon,* 275 N.W.2d at 448. While she recognizes absences may amount to misconduct, she asserts such absences must be both excessive and unexcused. *Sallis v. Emp't Appeal Bd.*, 437 N.W.2d 895, 897 (Iowa 1989). Irving concedes that absences due to "matters of purely personal responsibilities" are not excused absences.

*Harlan*, 350 N.W.2d at 194; *Higgins*, 350 N.W.2d at 191. She distinguishes these cases, however, arguing that in each of them there was a pattern of persistent absences that amounted to an intentional act or omission sufficient to support a misconduct discharge. She contrasts the "personal responsibilities" cases with *Roberts*, 356 N.W.2d at 220. In *Roberts*, an employee was absent without notice for three days after being hospitalized for a serious mental impairment. *Id.* Irving argues that in *Roberts*, the court found that the claimant did not commit misconduct because her conduct was "not volitional, but the result of inability or incapacity."

Irving stresses that she was not guilty of the offenses for which she was incarcerated and that as a result, her absence cannot be considered volitional. She argues it was not foreseeable that she would be arrested for a crime for which she was not guilty. From the premise that the employer must prove volition, Irving argues there was no evidence in the record to support such a determination and that as a result, the agency's determination was not supported by substantial evidence. *See* Iowa Code § 17A.19(10)(*f*).

**D. Authorities from Other States Regarding Absence Due to Incarceration as Misconduct.** Many employment security statutes, like Iowa's, have open-ended statutory provisions providing for disqualification from receipt of unemployment benefits for employee misconduct. The seminal case defining what constitutes misconduct for purposes of disqualification from receiving unemployment benefits is *Boynton Cab Co. v. Neubeck*, 296 N.W. 636, 640 (Wis. 1941). That case established a standard of misconduct that was closely tracked in the Iowa administrative rule. *Compare id.*, *with* Iowa Admin. Code r. 871—24.32(1)(*a*). We repeatedly have said the *Boynton* standard—as reflected

in Iowa's administrative rules— accurately reflects the intent of the Iowa legislature. *Freeland v. Emp't Appeal Bd.*, 492 N.W.2d 193, 196 (Iowa 1992); *Sallis*, 437 N.W.2d at 896–97; *Huntoon*, 275 N.W.2d at 447–48.

The *Boynton* standard for misconduct disqualification is generally thought to be quite demanding. It certainly exceeds the standard required in most cases for just-cause termination from employment. A handful of states have chafed under the rule and promulgated statutes or regulations departing from it. *See, e.g.*, Ariz. Rev. Stat. Ann. § 23-775(2) (2016) (disqualifying employees from benefits for "willful *or negligent* misconduct") (emphasis added)); Minn. Stat. § 268.095, subdiv. 6 (including within the definition of misconduct "any intentional, *negligent*, or indifferent conduct" (emphasis added)).

The *Boynton* standard has been applied by state courts in a number of cases involving absence from work due to incarceration. For example, in *In re Benjamin*, 572 N.Y.S.2d 970, 971 (App. Div. 1991) (per curiam), the court considered whether an employee who was arrested on drug charges but unable to make bail had committed a willful or deliberate act sufficient to support disqualification from employment benefits based on misconduct. The court noted that the defendant made every effort to obtain funds necessary to post bail and as a result, the failure to make bail was not a willful or deliberate act upon which a finding of misconduct could have been predicated. *Id.* at 971–72.

The *Benjamin* court also considered whether the drug arrest on the drug possession charge supported a finding of misconduct. *Id.* at 972. The record showed that the charge was ultimately dismissed and there was no evidence in the record to suggest that the claimant was in fact involved in any drug related activity. *Id.* The court ruled the possession charge alone could not constitute misconduct, noting that to hold

otherwise would give rise to an implication that "willfulness has come to mean being in the wrong place at the wrong time." *Id.* Further, the court noted that such a holding "would establish a dangerous precedent, i.e., that disqualifying conduct may be predicated on a mere arrest unsupported by a conviction." *Id.* While there was also an underlying disorderly conduct charge, the court noted that this charge was not the basis of the employee's pretrial incarceration and thus could not establish misconduct. *Id.*

A similar result was reached by the Supreme Court of Nevada in the divided decision of *State v. Evans*, 901 P.2d 156, 156–57 (Nev. 1995). In that case, the claimant was arrested and lost her job because she was forced to remain in jail pending trial and could not afford bail. The Nevada court noted that neither her pretrial incarceration nor her criminal acts were related to her employment. *Id.* at 156. Further, the court emphasized that Evans's failure to be available for work was predicated on her inability to obtain bail, not her criminal conduct. *Id.* As a result, the claimant was not guilty of misconduct or any deliberate violation or disregard of standards of behavior which her employer has the right to expect. *Id.* at 156–57.

The Minnesota Supreme Court has considered issues related to misconduct arising from incarceration in a series of cases. In *Grushus v. Minnesota Mining & Manufacturing Co.*, the Minnesota Supreme Court found that an employee's incarceration under the facts of the case amounted to misconduct sufficient to disqualify the employee from receiving unemployment benefits. 100 N.W.2d 516, 520 (Minn. 1960). The *Grushus* court, however, declined to adopt a rule that absenteeism resulting from incarceration was misconduct as a matter of law. *Id.* at

519. Instead, the court emphasized that whether a disqualifying event occurred depended upon the facts of each particular case. *Id.*

After *Grushus*, the Minnesota Supreme Court revisited the question of whether incarceration amounted to disqualifying misconduct in *Jenkins v. American Express Financial Corp.*, 721 N.W.2d 286, 288 (Minn. 2006). In *Jenkins*, the employee insurance specialist was convicted of assaulting a nurse while being treated for a broken ankle. *Id.* She was sentenced to thirty days in jail with work release privileges. *Id.* Her employer informed her that she would be able to maintain her employment while on work release. *Id.* The employer, however, refused to confirm her employment with work release officials and, as a result, the employee was not able to report to work. *Id.* The employer then fired the employee for failure to report to work. *Id.* The claimant sought unemployment benefits, but the administrative agency determined that she had been terminated for misconduct as a result of her incarceration. *Id.* at 288–89. The Minnesota Court of Appeals affirmed, noting that the claimant "engaged in the behavior that led to her incarceration." *Id.* at 289.

On appeal, the Minnesota Supreme Court recognized that incarceration following a conviction of a crime may be misconduct sufficient to deny benefits, but such a conclusion depended upon the facts and circumstances of the case. *Id.* at 290. The *Jenkins* court concluded under the facts, misconduct had not been shown. *Id.* at 291. The court distinguished prior Minnesota cases upholding disqualifications for misconduct where a claimant was incarcerated, noting in the prior cases, the claimants either failed to contact their employer until after work was missed or engaged in deception concerning the reasons for the claimant's inability to return to work. *Id.* On the

other hand, the court recognized that a period of incarceration under appropriate circumstances may be evidence that an employee lacked concern about his or her employment. *Id.*

The failure to notify the employer of absence as a result of incarceration was emphasized by the Missouri Court of Appeals in *Moore v. Swisher Mower & Machine Co.*, 49 S.W.3d 731, 739–40 (Mo. Ct. App. 2001). The claimant boxer and assembler was incarcerated on a charge of assault. *Id.* at 734. He was unable to post bail and remained incarcerated for several months. *Id.* The employer discharged him for failing to attend work or to report his absence. *Id.* Ultimately, the charges were dropped. *Id.* Upon his release, the claimant filed for unemployment. *Id.*

The *Moore* court rejected the notion that the claimant voluntarily quit his employment. *Id.* at 739. Yet the court noted that the claimant was fired for violating the employer's policy requiring employees to call in and report days when they needed to be absent from work. *Id.* The *Moore* court emphasized that failure to properly report absences according to an employer's reasonable policy amounts to a deliberate violation of employer rules and ultimately disqualifying misconduct. *Id.* at 740.

**E. Iowa Caselaw on Misconduct Arising from Absenteeism.** As noted above, the Iowa administrative rule defining misconduct closely parallels the *Boynton* standard. We have stated that the language in the rule fairly reflects the intention of the legislature. *Cosper*, 321 N.W.2d at 9. "Misconduct connotes volition. A failure in good performance which results from inability or incapacity is not volitional and is thus not misconduct." *Huntoon*, 275 N.W.2d at 448.

In *Cosper*, we considered a case where the claimant had a history of absences. 321 N.W.2d at 6. The claimant was warned by her employer repeatedly about her absences. *Id.* at 7. Ultimately, her employer terminated her. *Id.* The agency determined she was terminated for misconduct, a conclusion upheld by the district court. *Id.* at 7–8.

In *Cosper*, the administrative agency adopted a rule regarding excessive absenteeism which stated that "[e]xcessive absenteeism is an intentional disregard of the duty owed by the claimant to the employer and shall be considered misconduct." *Id.* at 9. Notably, the rule did not distinguish between excused and unexcused absences. *See id.*

We took exception to the agency's broad absenteeism rule. *Id.* at 10. We observed that, contrary to the Iowa administrative rule, the general approach in the caselaw was that mere absenteeism is not a consequence that amounts to disqualifying misconduct under unemployment insurance statutes. *Id.* Noting that we were not bound to follow the department's interpretation of the law, we declared that we did not approve the absenteeism rule interpreting misconduct "because it draws no distinction between excused and unexcused absences." *Id.* Stressing that the Iowa Employment Security Law should be interpreted liberally to achieve the legislative goal of minimizing the burden of unemployment, we held that excessive absences are not misconduct unless they are unexcused. *Id.* Because it was not clear whether the district court or the agency found the absences unexcused, we remanded the case to the district court for remand to the agency to make necessary findings. *Id.* at 10–11.

Two years later, we considered another absenteeism issue in *Higgins*, 350 N.W.2d at 188. In *Higgins*, a rewrap clerk was absent or

late fourteen times during a six-month period. *Id.* at 189. During this time frame, the employee was placed on probation and warned to "be on time every day in the future" to avoid disciplinary action. *Id.* After the warning, the claimant was again late because she overslept. *Id.* The employer terminated her for excessive absenteeism. *Id.*

We upheld a determination of the agency that the absences amounted to disqualifying misconduct. *Id.* at 192. Significantly, the agency had amended its rule after our disapproval of its earlier version in *Cosper. Id.* at 190. The new version of the rule, which remains in effect today, provided,

> Excessive unexcused absenteeism is an intentional disregard of the duty owed by the claimant to the employer and shall be considered misconduct except for illness or other reasonable grounds for which the employee was absent and that were properly reported to the employer.

*Id.* (emphasis omitted); *see* Iowa Admin. Code r. 871—24.32(7). Thus, under the new version of the rule, absenteeism due to illness or other factors that were properly reported to the employer were not grounds for a misconduct disqualification. The record revealed "seven instances of absenteeism resulting from personal problems or predicaments[,] . . . includ[ing] oversleeping, delays caused by tardy babysitters, car trouble, and no excuse." *Higgins*, 350 N.W.2d at 191. Under the facts presented in *Higgins*, we concluded that substantial evidence supported a finding of misconduct based upon excessive *unexcused* absenteeism. *Id.* at 192; *see also Harlan*, 350 N.W.2d at 192 ("Habitual tardiness or absenteeism arising from matters of purely personal responsibilities such as transportation can constitute unexcusable misconduct.").

We explored the question of what absences might be excusable for purposes of determining misconduct disqualification for absenteeism in

*Roberts*, 356 N.W.2d at 222. In that case, a merchandise office clerk called in indicating she had a cold and would not be in to work that day and "maybe several days." *Id.* at 219. She did not call into the office on two succeeding days when she stayed home for illness. *Id.* When she returned to work, she was given a warning notice and was suspended for two days for unreported absence. *Id.* Shortly thereafter, the claimant was admitted to Broadlawns Medical Center for treatment of a condition diagnosed as schizophrenia, paranoid type. *Id.* at 219–20. For two days, the claimant was taking medication that affected her memory. *Id.* at 220. Her physician testified that she was "unable [to] protect her own interests at that time, in particular, she was unable to call her employer each day to report her absence." *Id.*

We rejected the employer's position that the absences amounted to misconduct. *Id.* at 222. We held that the first round of absences could not be considered an "intentional disregard of her duty" to her employer. *Id.* We further held that with respect to her hospitalization, the record established as a matter of law that she was unable to protect her own interest due to her medication and illness. *Id.* We emphasized that under Iowa law, misconduct connotes volition. *Id.* We concluded that the claimant's absence and failure to report due to illness did not amount to disqualifying misconduct. *Id.*

Finally, in *Sallis*, a part-time dishwasher experienced car troubles and could not get to work. 437 N.W.2d at 895. He called a supervisor, who told him to call back later and advise them about the situation. *Id.* The claimant did not call back. *Id.* When asked why he did not call back, the employee declared that he was more concerned about his car than his job. *Id.* After this conversation, the manager decided to fire the claimant. *Id.* at 896. The agency concluded that the failure of the

claimant to call his employer back established a willful and wanton disregard of the employer's interests. *Id.*

We reversed, holding that the facts were insufficient to meet the demanding standard of misconduct. *Id.* at 897. We noted that the jurisdictions were divided on the question of whether a single act could arise to misconduct. *Id.* We held that whether or not misconduct was present depended upon all the underlying facts and circumstances. *Id.*

**F. Analysis.** As with the other issues in this case, the general and specific rules outlined earlier in this opinion apply. In considering what amounts to misconduct under the statute and administrative rules, we must (1) liberally construe the statute in light of its policy goals, *see Bridgestone/Firestone,* 570 N.W.2d at 96; (2) place the burden of proof of showing disqualification on the employer, *see Bartelt,* 494 N.W.2d at 686; and (3) narrowly interpret any statutory provision related to disqualification, *see Bridgestone/Firestone,* 570 N.W.2d at 96.

At the outset, it is important to reiterate that in Iowa, misconduct for purposes of unemployment insurance is not the same as misconduct for purposes of termination by an employer. *See Lee v. Emp't Appeal Bd.,* 616 N.W.2d 661, 665 (Iowa 2000) ("Misconduct serious enough to warrant the discharge of an employee is not necessarily serious enough to warrant a denial of benefits." (Quoting *Reigelsberger,* 500 N.W.2d at 66.)). The Iowa approach distinguishing misconduct for purposes of unemployment benefits from just-cause termination of employment is consistent with the law of many jurisdictions. *See, e.g., Manning v. Alaska R.R.,* 853 P.2d 1120, 1125 (Alaska 1993) (differentiating misconduct for unemployment purposes from just cause for termination); *Weller v. Ariz. Dep't of Econ. Sec.,* 860 P.2d 487, 490 (Ariz. Ct. App. 1993) (noting misconduct for purposes of termination and misconduct for

purposes of employee benefits are "two distinct concepts"); *Johnson*, 53 A.3d at 326–27 ("In determining whether an employee has engaged in disqualifying misconduct, [we] cannot simply inquire whether the employer was justified in his decision to discharge the employee." (Quoting *Jadallah v. D.C. Dep't of Emp't Servs.*, 476 A.2d 671, 675 (D.C. 1984).)); *Spink v. Unemployment Appeals Comm'n*, 798 So. 2d 899, 901–02 (Fla. Dist. Ct. App. 2001) (distinguishing between acts of misconduct justifying termination and those disqualifying employee from unemployment benefits); *Holmes v. Review Bd. of Ind. Emp't Sec. Div.*, 451 N.E.2d 83, 87–88 (Ind. Ct. App. 1983); *Hunt v. Gen. Elec. Co.*, 444 N.Y.S.2d 492, 493 (App. Div. 1981). These cases demonstrate that for purposes of unemployment insurance, "misconduct" is a term of art that is ordinarily implemented in accompanying administrative regulations. Thus, while the employer here argued before the agency that Irving violated its employment policies, this is a different issue from whether Irving is disqualified for misconduct for purposes of unemployment insurance benefits.

With respect to misconduct in the specific context of unemployment insurance benefits, our statute is nearly identical to that interpreted by the *Boynton* court. The decision of the *Boynton* court, which established a demanding standard for misconduct that has been cited widely in unemployment insurance cases across the country, was powered by the beneficial purpose of the statute, which the court noted was "to cushion the effect of unemployment by a series of benefit payments." *Boynton*, 296 N.W. at 639; *see also Bridgestone/Firestone*, 570 N.W.2d at 96; *Roberts*, 356 N.W.2d at 221.

As noted above, the *Boynton* standard for misconduct was incorporated virtually verbatim in rule 871—24.32(1)(*a*) and by our

caselaw. Under the Iowa *Boynton*-type standard for misconduct, a claimant must have committed "a deliberate act or omission" which breaches their duties as an employee. Iowa Admin. Code r. 871—24.32(1)(*a*). Under the rule, an employee must engage in "willful or wanton disregard" of the employer's interest or "carelessness or negligence of such degree of recurrence" as to allow the inference of equally intentional disregard. *Id.* "[I]nability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion" are not misconduct. *Id.*

We have little trouble concluding that the EAB failed to establish misconduct under the demanding *Boynton* standards in this case. We recognize that in some instances, conduct leading to incarceration may be so egregious and incarceration interfering with employment so predictable that an employer may establish willful or wanton disregard of its interests. We further recognize that failure to inform the employer of the incarceration, particularly over extended periods of time, may amount to misconduct. Yet the meaning of *Cosper* is that it is not enough for absences to be excessive; they must also be unexcused. *See Cosper*, 321 N.W.2d at 10. Indeed, the rule itself requires absences be unexcused if they are to constitute misconduct. Iowa Admin. Code r. 871—24.32(7).

The problem with the EAB's position is that it ignores the clear limitations on misconduct under the statute and its implementing regulations. We have repeatedly declared that misconduct requires volition or its statutory equivalent. *See Roberts*, 356 N.W.2d at 222; *Huntoon*, 275 N.W.2d at 448. As quoted above, the key language is, "Misconduct connotes volition. A failure in good performance which

results from inability or incapacity is not volitional and is not misconduct." *Huntoon*, 275 N.W.2d at 448.

Interestingly, in *Cosper,* we rejected an argument very similar to that advanced by the EAB here. *See* 321 N.W.2d at 10. In *Cosper,* the agency attempted to enforce an administrative rule that declared absences were automatically considered a voluntary quit. *Id.* at 9. We rejected that argument, noting a voluntary quit does not arise from absences that were excused. *Id.* at 10. *Cosper* stands for the proposition that overbroad per se rules related to disqualification due to absence are inconsistent with the statute. Now, under the guise of misconduct, the EAB is attempting to achieve the same result.

Our post-*Cosper* cases demonstrate this court's adherence to its principal holding. In *Roberts,* we rejected the notion that hospitalization for mental illness and the inability to report the absence due to incapacitation amounted to misconduct. 356 N.W.2d at 222. Just as we did not consider hospitalization due to mental illness a consequence of failure of personal responsibility, in *Roberts,* we do not think the record here supports a finding of misconduct where the claimant was absent due to incarceration, where the charge was later dropped, and where the claimant made arrangements to have her mother contact her employer on a daily basis until instructed not to do so.[1]

---

[1]For cases in other jurisdictions coming to similar results, see, for example, *Magma Copper Co. v. Arizona Department of Economic Security*, 625 P.2d 935, 937 (Ariz. Ct. App. 1981) (holding employer has the burden of proving incarceration rose to level of misconduct necessary to disqualify from benefits); *Baldor Electric Co. v. Arkansas Employment Security Department*, 27 S.W.3d 771, 774 (Ark. Ct. App. 2000) (allowing benefits notwithstanding incarceration); *Holmes*, 451 N.E.2d at 87–88 (holding incarceration without conviction may be good cause for termination but does not preclude an employee from receiving benefits); *City of Monroe v. Tolliver*, 954 So.2d 203, 206–07 (La. Ct. App. 2007) (holding incarceration did not constitute willful violation of attendance policy); and *Barker v. Employment Security Department of the State of Washington*, 112 P.3d 536, 539 (Wash. Ct. App. 2005) (holding a finding of misconduct

We think the personal-misconduct cases are plainly distinguishable from the present situation. For example, in *Higgins*, we recognized that absences must be not only excessive, but also unexcused. 350 N.W.2d at 191. The kind of repeated, habitual behavior considered in that case may be misconduct under the applicable rule because it shows "carelessness or negligence of such degree of recurrence as to manifest equal culpability, wrongful intent or evil design, or . . . show[s] an intentional and substantial disregard of the employer's interests." Iowa Admin. Code r. 871—24.32(1)(*a*). The record here simply does not contain such disdain for the employer's interests.

We further find that involuntary incarceration, at least where the charges are dismissed, also falls within the "other reasonable grounds" for absence contemplated under rule 871—24.32(7). Like illness, absences due to incarceration are involuntary. In this case, the employer failed to show that Irving could be disqualified under section 24.32(7). *Sallis*, 437 N.W.2d at 896 (holding employer has burden of showing disqualifying misconduct).

We emphasize, as we have done earlier, that our conclusion that the record does not support a disqualification for unemployment benefits does not necessarily mean the employer could not lawfully terminate Irving's employment. Nevertheless, there was not substantial evidence in the record to support Irving's disqualification from benefits on grounds of misconduct. *See* Iowa Code § 17A.19(10)(*f*).

---

is not supported by incarceration for violation of a no-contact order of which employee was not aware).

**VI. Absence from Employment Due to Incarceration for Criminal Charges Ultimately Dismissed as a Voluntary Quit.**

**A. Introduction.** This case presents one final issue. The precise question raised is whether involuntary incarceration that causes absence from work presents an irrebuttable presumption of disqualification of eligibility for unemployment benefits because, as a matter of law, such incarceration results in a voluntary quit. Once again, the distinctly different question of whether incarceration provides the basis for a lawful termination of employment is not before us.

**B. Iowa Statutory Provisions and Administrative Rules Related to Misconduct and Voluntary Quits**. The key provision of law at issue here is Iowa Code section 96.5, which provides that employees are disqualified for unemployment benefits if they have left work "voluntarily without good cause attributable to the individual's employer." Iowa Code § 96.5(1).

The statute does not provide further elaboration of what is meant by the term "voluntarily." Iowa Workforce Development, however, has promulgated a rule, which provides, "[T]he following reasons for a voluntary quit shall be presumed to be without good cause attributable to the employer: . . . The claimant is deemed to have left if such claimant becomes incarcerated." Iowa Admin. Code r. 871—24.25(16). The EAB and the district court found that Irving's imprisonment was a voluntary quit under section 96.5(1) and its implementing regulations.

The statute contains a provision related to the burden of proof regarding voluntary quits. The general rule in the statute is that the burden of proof with respect to disqualification for benefits rests with the employer. Iowa Code § 96.6(2). Notwithstanding the general rule, the

claimant has the burden of "proving that a voluntary quit . . . was for good cause attributable to the employer." *Id.*

**C. Positions of the Parties.** Irving argues that she did not leave her work voluntarily under the statute and that because she was involuntarily incarcerated, her absence from work cannot be regarded as a voluntary quit under the regulation. She notes that because neither Iowa Code section 96.5(1) nor Iowa Administrative Code rule 871—24.25(16) define "voluntarily" or "voluntary quit," these terms should be given their ordinary and common meaning. She suggests that the EAB's interpretation of Iowa Administrative Code rule 871—24.25(16) extends the term "voluntary" to cover acts that are unforeseeable and without volition when it asserts incarceration results in a voluntary quit without requiring an additional finding of culpability or intent. These interpretations, according to Irving, are beyond the authority vested in the agency by the legislature. *See* Iowa Code § 17A.19(10)(*b*). When the law of voluntary quits is correctly viewed, Irving maintains, there is no substantial evidence to support her disqualification from receiving benefits. *See* Iowa Code § 17A.19(10)(*f*).

The EAB argues that Iowa Administrative Code rule 871—24.25(16), stating that incarceration will be presumed a voluntary quit, is a rule that is a rational interpretation of the Employment Security Law. The EAB has been delegated the authority to interpret the Employment Security Law, it argues, and so the standard for the validity of the rule is that it must not be "irrational, illogical, or wholly unjustifiable." *See* Iowa Code § 17A.19(10)(*l*). Further, the EAB argues that if incarcerations are not presumed to be a voluntary quit even without evidence of guilt, it would lead to the unreasonable result of an employer needing to

investigate the guilt of their employee before they were discharged or having to prove the employee's guilt at the EAB hearing.[2]

**D. Authority from Other States Regarding Incarceration as a Voluntary Quit.** We have not had an opportunity to address the question of the impact of incarceration on disqualification for unemployment benefits under Iowa Code section 965(1). Although other states' cases are not uniform, the majority stand for the proposition that absence due to incarceration does not give rise to an irrebuttable presumption that the employee is disqualified from receiving unemployment benefits on the ground that the employee voluntarily quit employment.

Perhaps the case closest to our present controversy is *Parker v. Department of Labor & Employment Security*, 440 So. 2d 438, 439–40 (Fla. Dist. Ct. App. 1983). In that case, the Florida District Court of Appeal considered a case where an employee was arrested as a result of a domestic argument and was unable to pay bail. *Id.* at 438–39. The employee contacted his employer by phone and twice by letter during the approximately one-month period of incarceration. *Id.* at 439. Eventually, the charges were dropped. *Id.* at 439. Like Iowa Code section 96.5(1), the Florida unemployment statute disqualified from unemployment benefits a person who "voluntarily left his employment without good cause attributable to the employer." *Id.* (quoting Fla. Stat.

---

[2]While it may be true that "[l]ongstanding administrative interpretations are entitled to some weight in statutory construction," we remain responsible to determine if the administrative body is correct on the matter of law. *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 77 (Iowa 2015) (quoting *Griffin Pipe Prods. Co. v. Bd. of Review*, 789 N.W.2d 769, 775 (Iowa 2010)); *Painters & Allied Trades Local Union 246 v. City of Des Moines*, 451 N.W.2d 825, 826 (Iowa 1990) ("An administrative agency's construction of a statute, however, does not make law or change the legal meaning of a statute. This court is the final arbiter of a statute's meaning.").

§ 443.101(1)(*a*) (1981)). The Florida court rejected the claim that the employee voluntarily quit his job. *Id.* The court noted there was nothing in the record to indicate the employee committed the offense with which he was charged. *Id.* Further, the employee kept his employer advised of his status. *Id.* As a result, the court concluded that the employee was entitled to receive unemployment compensation. *Id.* at 439–40.

Another instructive case is *Ford v. Labor & Industrial Relations Commission of Missouri*, 841 S.W.2d 255, 256 (Mo. Ct. App. 1992) (per curiam). In that case, the Missouri Court of Appeals considered a case where a truck driver was charged with parental kidnapping. *Id.* The employee notified his employer prior to his arrest and then again after his arrest and extradition to Missouri. *Id.* at 256–57. There was no evidence in the record, however, that the employee was convicted on the kidnapping charge. *Id.* at 258.

The court concluded the employee should not be disqualified from receiving unemployment benefits. *Id.* at 258–59. Like the Iowa statute, the Missouri statute declared that one of its purposes was to provide benefits to be used by "persons unemployed through no fault of their own." *Id.* at 257 (quoting Mo. Rev. Stat. § 288.020.1 (1986)). The court noted, however, that an arrest is never, "in itself, a voluntary act." *Id.* at 258. Further, the court concluded that incarceration cannot be deemed voluntary if the employee never in fact committed the crime for which he was arrested. *Id.* The court held that it would require either evidence in the record that the employee had been convicted or "other evidence of his guilt" in order to deny him unemployment benefits. *Id.*

Another instructive decision out of Missouri on this point is *Moore*, 49 S.W.3d at 737–39. As discussed above, the claimant in *Moore* was arrested and jailed on a charge of assault, could not post bond, and was

incarcerated for several months. *Id.* at 734. He maintained innocence, and the charges were eventually dismissed. *Id.* The *Moore* court rejected the notion that his incarceration was a voluntary quit, noting that the disqualifying provisions of Missouri law must be strictly and narrowly construed in favor of finding that an employee is entitled to compensation. *Id.* at 739.[3]

In all the above cases, there were no criminal convictions or admissions of guilt, and the employer was notified of the reasons for the employee's absence. Where there are admissions or convictions of guilt, or where an employee has not notified an employer of his or her incarceration, a disqualification becomes more likely.

For example, in a California case, an employee was sentenced to jail for his role in a hit-and-run accident. *Sherman/Bertram, Inc. v. Cal. Dep't of Emp't,* 21 Cal. Rptr. 130, 131 (Dist. Ct. App. 1962). The employee lost his job and, upon being released, filed for unemployment benefits. *Id.* In considering whether the employee "voluntarily quit his job without good cause," the court considered the purpose of the California Unemployment Insurance Code as stated in its guide to interpretation, which was to provide benefits for "persons unemployed through no fault of their own." *Id.* at 131–32 (quoting Cal. Unemp. Ins. Code § 100 (1958)). The court declared that to suggest the employee was unemployed through no fault of his own was "pure sophistry" because of his "wil[l]ful and felonious act in leaving the scene of an accident." *Id.* at 132. Plainly, the California court believed that the guilt of the employee was established. Therefore, even though the employee did not intend to

---

[3]As mentioned above, the *Moore* court nevertheless found that the failure of the claimant to report his absence when he could have done so was misconduct and that the record supported such a finding. 49 S.W.3d at 740.

become incarcerated, nor to become unemployed, he nevertheless "voluntarily embark[ed] upon a course of conduct, the very nature of which he knew . . . would jeopardize his return to work." *Id.* at 133. Therefore, the court found that the employee's incarceration was a voluntary quit. *Id.* at 133–34.

Subsequent to the *Sherman/Bertram* case, the California legislature passed a statute providing,

> If the employment of an individual is terminated due to his absence from work for a period in excess of 24 hours because of his incarceration and he is convicted of the offense for which he was incarcerated or of any lesser included offense, he shall be deemed to have left his work voluntarily without good cause . . . .

Cal. Unemp. Ins. Code § 1256.1 (2015). In hearing a challenge to this law, a California court found it constitutional, stating,

> The Legislature has determined persons who are *terminated as a direct result of their criminal behavior and incarceration* are not "unemployed through no fault of their own" and are therefore ineligible for benefits. The classification is reasonable and bears a rational relation to the objective of unemployment compensation law.

*Jefferson v. Unemployment Ins. Appeals Bd.*, 130 Cal. Rptr. 405, 410 (Ct. App. 1976) (emphasis added).

One New Jersey case seems to be an outlier. In *Fennell v. Board of Review,* 688 A.2d 113, 113 (N.J. Super. Ct. App. Div. 1997), a New Jersey appellate court confronted a case in which the employee was arrested and unable to post bail for nine months. The aggravated assault charges against him were ultimately dropped. *Id.* Similarly to Iowa, the courts in New Jersey state that the purpose of their unemployment compensation law is to protect the state's citizens of the "hazards of economic insecurity due to involuntary unemployment." *Id.* at 114. Unlike other courts, the New Jersey court focused entirely on the

"without good cause attributable to work" element of the "voluntary quit without good cause attributable to work" language. *Id.* The court did not seem to consider the lack of voluntariness, instead stating that the employee's inability to post bail was an "unfortunate economic and legal problem[] . . . *not related to his employment.*" *Id.* at 115 (emphasis added).

**E. Iowa Caselaw Regarding Absenteeism as a Voluntary Quit.** While we have yet to decide a case on the issue of incarceration as a voluntary quit, we have considered cases discussing voluntariness in other unemployment compensation settings.

One of our early cases dealing with the question of voluntary quits under the Iowa Employment Security Law is *Moulton*, 239 Iowa at 1165–73, 34 N.W.2d at 213–17. In that case, a pregnant employee left the workplace and sought unemployment benefits. *Id.* at 1162–63, 34 N.W.2d at 212. We framed the issue as whether the physical disability due to her pregnancy made her quitting work voluntary or involuntary. *Id.* at 1164–65, 34 N.W.2d at 213.

In *Moulton*, we cited an early Iowa case for the proposition that voluntary means an act "of her own volition or choice." *Id.* at 1165, 34 N.W.2d at 213 (citing *Margoris v. U.S. R.R. Admin.*, 187 Iowa 605, 608, 174 N.W. 371, 372 (1919)). Finding an analogy to persons who deliberately maim themselves to be unfit for work, we held the termination of employment was voluntary. *Id.*

We revisited the issue of voluntariness in *Cook*, 299 N.W.2d at 701–02. As discussed above, the claimant in *Cook* received numerous speeding tickets, mostly during nonworking hours. *Id.* at 699. The claimant's job, however, consisted of delivering loads of groceries from his employer's warehouse to local merchants. *Id.* When the employer's

insurance carrier advised the employer that it would no longer insure the claimant, the claimant was terminated. *Id.* at 700. The claimant then applied for unemployment benefits. *Id.*

The first question in *Cook* was whether his termination could be considered voluntary as found by the agency but reversed by the district court. *Id.* The *Cook* court agreed with the district court. *Id.* at 701. We made short work of the argument. We cited an administrative rule, which stated that "in general, a voluntary quit means discontinuing the employment because the employee no longer desires to remain in the relationship of an employee with the employer." *Id.* We noted that the claimant did not leave as a result of unsafe working conditions, "[n]or did he quit because he desired to do so." *Id.* at 701–02. We declared under the facts that "[u]nquestionably this was not a case of a 'voluntary quit.' " *Id.* at 702. In *Cook*, external actions by law enforcement did not give rise to a voluntary quit for purposes of disqualification for unemployment benefits even though the claimant's poor driving record had an adverse impact on the employer when the insurer decided to drop coverage for the claimant. *Id.*

In *Ames v. Employment Appeal Board*, 439 N.W.2d 669, 670–72 (Iowa 1989), we considered another interesting case dealing with voluntary quits. In *Ames*, employees at two plants refused or were pressured not to cross a union picket line. *Id.* After the employees were terminated, they sought unemployment benefits, claiming they did not voluntarily leave their jobs due to the risk of violence associated with crossing the picket lines. *Id.*

Our first holding was that it was not necessary for the claimants to demonstrate that the departure from employment was "for good cause attributable to the employer." *Id.* at 673–74. We held that it is not

necessary to make such a showing if the termination was not voluntary. *Id.* at 674. Under the facts of that case, we concluded that some of the claimants were involuntarily separated from employment because of the threat of violence, while others failed to make an adequate showing. *Id.* at 674–75. In *Ames*, external forces not attributable to the employer provided the basis for determining that a termination of employment was not voluntary.

In *Sharp*, 479 N.W.2d at 283–84, we relied on *Ames* in reaching a similar outcome under a different fact pattern. The claimant meat cutter left her job in a turkey plant because she developed viral hepatitis. *Id.* at 281. Her doctor advised her not to work with food or cleaning solvents. *Id.* As a result, she did not return to work. *Id.* The question in the case was whether the quit should be considered voluntary or involuntary for purposes of unemployment benefits. *Id.*

We held that her departure was not voluntary for purposes of determining disqualification for unemployment benefits. *Id.* at 284. We again stated that the purpose of the "without good cause attributable to the employer" language was to ensure that an employee voluntarily leaving the workplace could nonetheless qualify for benefits under some circumstances. *Id.* at 283. Although the employer was not responsible for the viral hepatitis, we held that the claimant's departure could not be considered voluntary. *Id.* at 283–84. The unmistakable feature of *Sharp* is that the "without good cause" language is designed to broaden, and not narrow, the grounds upon which unemployment benefits might be obtained. *See id.* at 283.

We revisited the issue of whether departure from a job due to pregnancy amounted to a voluntary quit in *Wills v. Employment Appeal Board*, 447 N.W.2d 137, 138 (Iowa 1989). In *Wills*, the claimant, a

nurse's aide, left employment when, after presenting her employer with lifting restrictions from her doctor, the employer advised her that she could no longer work at the facility. *Id.* at 137–38. We noted that under the applicable administrative rule, a voluntary quit in general "means discontinuing the employment because the employee no longer desires to remain in the relationship." *Id.* at 138. We also cited a South Dakota case for the propositions that "establish[ing] a voluntary quit requires that an employee intend to terminate employment." *Id.* (citing *In re Johnson*, 337 N.W.2d 442, 447 (S.D. 1983)). Yet, the record showed that the claimant was able to work notwithstanding her weight restrictions. We held that the termination of employment under the circumstances was not voluntary.

Finally, in *Bartelt*, we considered a case in which the president, sole stockholder, and salaried employee of a corporation applied for unemployment benefits after his corporation failed. 494 N.W.2d at 685. The individual filed for voluntary bankruptcy on behalf of his corporation, but he did so on legal advice based on the certainty that an involuntary bankruptcy would shortly occur. *Id.* After considering that a voluntary quit must entail a free choice, we found that the individual's actions were not voluntary because of the certainty of bankruptcy no matter what he did. *Id.* at 686–87. We noted that "when an outside force over which neither the employee nor the employer has any control creates the unemployment, the unemployment is involuntary." *Id.* at 686. We further stated that we would not "pretend there has been a voluntary quit" just because unemployment coverage might be inappropriate for the president, sole-owner, and employee of a single-owner corporation; such a decision is properly one for the legislature. *Id.* at 686–87.

**F. Analysis.** We reiterate here the general and specific rules of statutory interpretation presented earlier in this opinion. In considering the question of what amounts to a voluntary quit, we must (1) liberally construe the statute in light of its policy goals, *Bridgestone/Firestone*, 570 N.W.2d at 96; (2) place the burden of proof of showing disqualification on the employer, *Bartelt*, 494 N.W.2d at 686; and (3) narrowly interpret any statutory provision related to disqualification, *Bridgestone/Firestone*, 570 N.W.2d at 96.

Based upon our review of the statute, the authorities, and applicable caselaw, we conclude that a voluntary quit as a matter of law requires a volitional act on the part of the employee. We do not think that incarceration, in and of itself, can ever be considered "volitional" or "voluntary." Indeed, incarceration is perhaps the ultimate nonvolitional act.

The caselaw from other states teaches us, however, that the volitional principle does not mean that incarceration can never be part of the chain of events that gives rise to disqualification from unemployment benefits. The *predicate acts* that led to incarceration, however, must be volitional and must lead to an absence from the workplace that results in a loss of employment. In other words, a voluntary quit must be volitional at its inception. *See, e.g., Bartelt*, 494 N.W.2d at 687 (holding a voluntary quit must entail a free choice); *Wills*, 447 N.W.2d at 138 ("[A] voluntary quit requires that an employee intend to terminate employment."); *Cook*, 299 N.W.2d at 702 (finding no voluntary quit where employee did not desire to quit); *Moulton*, 239 Iowa at 1165, 34 N.W.2d at 213 (emphasizing employee's "own volition or choice").

The above survey of the cases demonstrates there is no doctrine of a constructive voluntary quit in Iowa law. A notion of constructive

voluntary quit would be completely inconsistent with the beneficial purposes of the Act and the requirement of strict construction of disqualification provisions. We especially do not believe that absence due to incarceration amounts to a constructive quit of a job.

That said, we can imagine circumstances where a deliberate volitional refusal to pay child support might predictably lead to incarceration. The incarceration then leads to absence from work, and the absence from work leads to termination. Under these circumstances, the volitional act of refusing to pay for child support might, perhaps, be considered a voluntary quit or, more likely, misconduct. Further, when an employee fails to notify the employer of the status of his or her incarceration, that may result in a voluntary quit or misconduct. *Moore*, 49 S.W.3d at 740.

We think, however, that incarceration in and itself does not establish a voluntary quit. Instead, the circumstances that led to the incarceration must establish volitional acts of a nature sufficient to allow a fact finder to draw the conclusion that the employee by his intentional acts has purposively set in motion a chain of events leading to incarceration, absence from work, and ultimate termination from employment. This is the essence of the teaching of the *Parker*, *Ford*, *Moore*, and *Hawkins* cases.

We recognize that the *Fennell* case from New Jersey takes a contrary position. Yet that case is distinguishable. In *Fennell*, the New Jersey court in effect interpreted the phrase "attributable to the employer" differently than our courts under Iowa caselaw. *See* 688 A.2d at 115. For a quit to be nonvoluntary under *Fennell*, the reasons for the quit must be attributed to the employer with very few and narrow exceptions. *See id.* That is simply not the law in Iowa. *See Sharp*, 479

N.W.2d at 283; *Ames*, 439 N.W.2d at 674. As a result, the *Fennell* case has no applicability here.

In light of the above, we now consider proper interpretation of rule 871—24.25(16). The EAB suggests that under the rule, incarceration is deemed to be "voluntary." In other words, the EAB is suggesting that its rule establishes a category of constructive voluntary quit.

But we think the EAB misreads its own rule. The rule states that the listed "reasons for a voluntary quit *shall be presumed to be without cause attributable to the employer.*" Iowa Admin. Code r. 871—24.25 (emphasis added). Thus, the focus of the rule is determining which departures from employment cannot be *excused* for purposes of disqualification for unemployment benefits because the quit was a result of cause attributable to the employer. Under subsection (16), a claimant is "deemed to have left if such claimant becomes incarcerated." *Id.* r. 871—24.25(16). Thus, when a claimant leaves employment due to incarceration, it cannot be maintained that the quit was due to "cause attributable to the employer."

The rule does not address the predicate issue of voluntariness. It only addresses the distinctly different issue of when an otherwise voluntary departure may nonetheless not lead to disqualification because of good cause attributable to the employer. As our caselaw repeatedly points out, these are separate issues. *Sharp*, 479 N.W.2d at 283; *Ames*, 439 N.W.2d at 674.

So construed, the rule is consistent with Iowa Code section 96.6(2). The statute allows a shifting of the burden of proof where a voluntary quit is claimed to not be disqualifying because of "good cause attributable to the employer." Iowa Code § 96.6(2). Irving, of course, makes no such claim. She only contends that her absence from employment due to her incarceration was not voluntary. The burden of

showing such voluntariness is unaffected by the rule and remains with the EAB under the statute.

In conclusion, under an interpretation of the statute, the applicable rule, and our caselaw, the employer has the burden of proving that a claimant's departure from employment was voluntary. The term "voluntary" requires volition and generally means a desire to quit the job. *Bartelt*, 494 N.W.2d at 686; *Wills*, 447 N.W.2d at 138; *Cook*, 299 N.W.2d at 701; *Moulton*, 239 Iowa at 1165–66, 34 N.W.2d at 213. Under the record here, the employer did not meet that burden. The record simply shows that Irving was arrested, that her incarceration continued for a period of time, that she was unable to make bail, and that the charges resulting in her incarceration were ultimately dropped. There is no substantial evidence to show that her absence from work was voluntary. As a result, the decision of the EAB must be reversed for lack of substantial evidence. Iowa Code § 17A.19(10)(*f*).

## VII. Conclusion.

For the above reasons, we hold that there is no spill-over effect from Irving's disqualification for misconduct, that the record does not support a finding of misconduct, and that there is no substantial support in the record to show that her absence from the workplace due to her incarceration was a voluntary quit. As a result, the decision of the agency is reversed.

**REVERSED.**

Cady, C.J., and Wiggins and Hecht, JJ., join this opinion. Cady, C.J., files a specially concurring opinion in which Wiggins, J., joins. Waterman, J., files an opinion concurring in part and dissenting in part in which Mansfield and Zager, JJ., join.

**CADY**, **Chief Justice (concurring specially).**

The statute at the center of the dispute in this case disqualifies an employee from receiving unemployment benefits when the employee was discharged from employment for misconduct associated with the employment. Iowa Code § 96.5(2) (2013). In turn, a long-standing agency rule supplements the statute by declaring excessive absenteeism constitutes misconduct and automatically disqualifies a terminated employee from unemployment benefits. Iowa Admin. Code r. 871—24.32(7). A separate agency rule supplements the statute, declaring involuntary incarceration constitutes a voluntary quit without good cause, which also disqualifies a terminated employee from unemployment benefits. Iowa Code § 96.5(1); Iowa Admin. Code r. 871—24.25(16).

I agree with the majority that each case of involuntary incarceration must be analyzed on its own facts. Further, some absenteeism due to incarceration might support misconduct under Iowa Code section 96.5(2), but some might not.

Notwithstanding, I write separately only to point out the importance of carefully considering how rules and statutes enacted over the years to resolve various issues can adversely impact a particular segment of people in society.

The agency absenteeism rule in this case has been in existence for over forty years. *See* Iowa Admin. Code r. 871—24.32(7). Yet as this case has revealed, when applied to situations of involuntary incarceration for a bailable offense, the rule can disproportionately affect those people in society without the financial resources to post bail. It means people with the financial resources to post bail are unlikely to

incur excessive absences due to a bailable-offense incarceration, while those without the financial ability to post bail suffer the consequences of the absenteeism rule.

Justice in our state will be advanced when all implicit bias found in our laws and rules can be identified and eliminated. This case is one example and is a step in the right direction.

Wiggins, J., joins this special concurrence.

**WATERMAN**, **Justice (concurring in part and dissenting in part).**

I respectfully dissent in part. I agree with the majority's conclusion that Irving's misconduct termination from her part-time job with employer Solon Nursing disqualified her from unemployment benefits for that position alone.[4] But I would affirm the district court and agency determination that Irving was properly denied unemployment benefits for missing three weeks of work without her employer's permission while she was incarcerated on charges of felony domestic abuse and making a false report calling 911. Iowa employers are entitled to expect their employees to show up for work. Being in jail is not a valid excuse for missing work.

The Administrative Law Judge (ALJ) who conducted the evidentiary hearing found that Irving violated her employment contract:

> The claimant did not have any available vacation hours and would have had to request a leave of absence in advance of the leave, in accordance with the union contract. The employer concluded the claimant effectively resigned after she was absent from duty for three consecutive work days without proper notification and authorization.

---

[4]Solon Nursing terminated Irving for misconduct when she failed to report her arrest within forty-eight hours as required for her position caring for disabled, dependent patients. The legislature specifically provided that a termination for *gross* misconduct cancels wage credits earned from "all employers." Iowa Code § 96.5(2)(*b*) (2013). By contrast, the legislature did not expressly provide that a termination for misconduct from a part-time position, without a finding of gross misconduct, by itself, disqualifies the individual for benefits for the loss of a job with a different employer. Presumably, if the legislature intended the misconduct disqualification for benefits in section 96.5(2)(*a*) to extend to all employers, it would have said so as it did for wage credits based on gross misconduct in the next paragraph. *See Oyens Feed & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 193–94 (Iowa 2011) (concluding the fact that a phrase was "selectively incorporated" in certain provisions showed the legislature's omission of that phrase in a related provision was intentional).

The Employment Appeal Board (EAB) and district court accepted the ALJ's finding. We are bound by the agency's findings of fact that are supported by substantial evidence. *Dico, Inc. v. Iowa Emp't Appeal Bd.*, 576 N.W.2d 352, 354 (Iowa 1998). Two witnesses for her employer, the University of Iowa Hospitals and Clinics (UHIC), testified that Irving was required under her employment contract to submit requests for a leave of absence thirty days in advance, which Irving failed to do. Reliable attendance is especially important in Irving's job as a medical assistant at a hospital. Irving failed to show up for work or obtain authorization for her absences during the three weeks preceding her termination. Substantial evidence supports the agency's finding that her prolonged unexcused absence violated her employment contract. That factual finding should be dispositive.

The EAB determined Irving was disqualified from receiving unemployment benefits for her UIHC job on three separate grounds: (1) her incarceration, deemed a voluntary quit under Iowa Administrative Code rule 871—24.25(16); (2) her absence for three days without notice, deemed a voluntary quit under rule 871—24.25(4); and (3) her excessive unexcused absenteeism, deemed misconduct under rule 24.32(7). The district court correctly affirmed on all three grounds. The majority errs by reversing on all three grounds.

The majority substitutes its own policy choice, that someone unable to make bail deserves unemployment benefits, for the eligibility determination of the agency charged with administering Iowa's complex statutory scheme for unemployment benefits. The agency in 1975 promulgated an administrative rule providing that persons who miss work due to incarceration are disqualified from receiving unemployment benefits. Iowa Admin. Code r. 370—4.25(16) (1975). I would not second-

guess that commonsense determination. The incarceration rule has been on the books and enforced by the agency for four decades without challenge.[5] *See id.* r. 871—24.25(16) (2016). The legislature, apparently satisfied with that rule, has repeatedly amended chapter 96 to add other exceptions and qualifications for the receipt of unemployment benefits while leaving the incarceration rule intact. *See, e.g.*, 2010 Iowa Acts ch. 1048, § 1; 1997 Iowa Acts ch. 132, § 1. "We consider the legislature's inaction as a tacit approval of the [agency's] action." *City of Sioux City v. Iowa Dep't of Revenue & Fin.*, 666 N.W.2d 587, 592 (Iowa 2003) ("The fact that this administrative rule has been in effect for eleven years strongly cautions against finding the rule invalid."). Of course, the legislature is free to overrule today's judicial policy choice requiring benefits for job loss attributable to incarceration.

The majority fails to strike the proper balance when interpreting chapter 96. We have previously recognized that chapter 96 strikes a balance between providing benefits for " 'persons unemployed through no fault of their own' . . . and fundamental fairness to the employer, who must ultimately shoulder the financial burden of any benefits paid." *White v. Emp't Appeal Bd.*, 487 N.W.2d 342, 345 (Iowa 1992) (quoting Iowa Code § 96.2 (1991)). In *Messina v. Iowa Department of Job Service,* we observed,

> The unemployment compensation statute . . . touches upon more than just the recipient. It provides for the creation of a

---

[5]I recognize that we do not generally regard the status of being incarcerated as "voluntary." However, the agency and the legislature were certainly entitled to conclude that incarceration in most cases results from voluntary conduct on the part of the incarcerated person. With a few commonsense exceptions, our unemployment compensation statute holds people responsible for getting to work and does not accept excuses such as car trouble, bad weather, or child-care issues. Being in jail is not one of those commonsense exceptions.

> fund produced by contributions from private employers. The rate of an employer's contribution to the fund varies according to benefits paid to that employer's eligible employees. Any action with regard to disbursements from the unemployment compensation fund thus will affect both the employer and the fiscal integrity of the fund.

341 N.W.2d 52, 62 (Iowa 1983) (quoting *Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 490, 97 S. Ct. 1898, 1909, 52 L. Ed. 2d 513, 529 (1977)). We noted the legislative goal of attracting and retaining job-creating industries is thwarted when "employees discharged for misconduct nonetheless are paid unemployment benefits from funds extracted from employers." *Id.* We stated,

> The fiscal integrity of the fund should not be jeopardized by payments to employees . . . discharged for [misconduct]. This would strike at the expressed state interest disclosed by the legislature in creating the fund [to] . . . "benefit . . . persons *unemployed through no fault of their own.*"

*Id.* (quoting Iowa Code § 96.2 (1983)). Today's decision may give employers and prospective employers pause. Some may become more reluctant to hire people viewed as being at risk of incarceration, such as persons who already have criminal records or records of arrests.

The majority undermines our "personal responsibility" precedents that disqualified claimants who were repeatedly late for work due to child care or transportation problems. I would honor stare decisis and follow our precedent to hold that Irving's three-week unexcused absence from work for personal reasons disqualified her from unemployment benefits. In *Cosper v. Iowa Department of Job Service*, we held that excessive unexcused absences can be disqualifying misconduct. 321 N.W.2d 6, 10 (Iowa 1982). The agency promulgated an administrative rule based on *Cosper*:

> *Excessive unexcused absenteeism.* Excessive unexcused absenteeism is an intentional disregard of the duty owed by

> the claimant to the employer and shall be considered misconduct except for illness or other reasonable grounds for which the employee was absent and that were properly reported to the employer.

Iowa Admin. Code r. 871—24.32(7). "[A]bsenteeism arising out of matters of purely personal responsibilities" is not excusable. *Higgins v. Iowa Dep't of Job Serv.*, 350 N.W.2d 187, 191 (Iowa 1984).

We considered a case of "purely personal responsibilities" in *Higgins*. *Id.* Barbara Higgins was employed by United Parcel Service. *Id.* at 189. In her last six months at UPS, she began to accumulate absences, and Higgins's supervisor reviewed her absences with her. *Id.* When she failed to report to work or give a reason on April 16, 1982, she was placed on a thirty-day probation. *Id.* Her probation required her to "be on time every day in the future and in attendance every day to avoid further disciplinary action." *Id.* On May 24, she was a few minutes late and told her supervisor the babysitter was late. *Id.* On June 2, she was fifteen minutes late because she overslept. *Id.* Higgins was fired on June 4. *Id.* Higgins sought unemployment benefits, and her claim was denied. *Id.* We affirmed the denial of benefits. *Id.* at 192. We held her absences were excessive and unexcused. *Id.* at 190–91. We said, "Oversleeping cannot be deemed a 'reasonable ground' for missing work." *Id.* at 191. Although the agency had found the absences due to Higgins's babysitter problems were excused, we disagreed, concluding that absenteeism caused by unreliable child care or transportation is not excusable. *Id.*

In a case filed the same day, we affirmed the agency's denial of benefits in *Harlan v. Iowa Department of Job Service*, 350 N.W.2d 192, 195 (Iowa 1984). Judith Harlan was employed at Younkers Brothers, Inc. for three years. *Id.* at 193. She received warnings in 1981 and 1982

regarding her tardiness. *Id.* at 194. In 1981, she told her employer she had car problems that required her to rely on public transportation. *Id.* After the warning in 1982, Harlan was late ten times over the course of about four months. *Id.* She arrived at work on those days from ten to sixty minutes after the start of her scheduled shift. *Id.* She frequently failed to give advance notice when she would be late. *Id.* Her tardiness made it difficult for her supervisors to adequately cover her department. *Id.* Harlan was discharged in May 1982 for excessive tardiness. *Id.* at 193. At the agency hearing, the hearing officer acknowledged that some of Harlan's tardiness was explainable due to issues with weather and public transportation, but Harlan was tardy in the late spring when weather was not an issue. *Id.* at 194. Moreover, Harlan had the option of taking an earlier bus. *Id.* These factors made her habitual tardiness disqualifying misconduct. *Id.*

Notably, we did not consider the individual's financial circumstances, such as an inability to afford child care or a reliable vehicle, in holding the absences from work constituted disqualifying misconduct. Nor should we expect the EAB or employers such as UIHC to assess an employee's financial ability to make bail or the likelihood charges will be dismissed in determining whether incarceration excuses an extended absence from work. I defer to the elected branches to make these policy choices. It is for the legislative and executive branches to decide whether Iowa is better off with a more lenient system of unemployment compensation—which results in higher premiums and higher costs of hiring employees—or a less lenient system that does not allow persons who missed work due to being in jail to collect benefits.

Irving's absenteeism is analogous to *Higgins* and *Harlan*. She was scheduled to work eight-hour shifts and missed ten work days in a row.

Irving's employer did not authorize her absence as required under the union contract. If being late repeatedly due to babysitter problems, a late bus, oversleeping, or car trouble is disqualifying misconduct regardless of the employee's financial circumstances, so too is missing work for ten shifts in a row due to an arrest and incarceration after a domestic dispute.

The majority relies on *Roberts v. Iowa Department of Job Service*, 356 N.W.2d 218, 222–23 (Iowa 1984), which I find readily distinguishable. Lanelle Roberts missed work when she was hospitalized for treatment of mental illness (schizophrenia, paranoid type). *Id.* at 219–20. Her employer fired her for excessive absenteeism, and she filed for unemployment benefits, which were denied based on the agency rule for excessive absenteeism.[6] *Id.* at 220. The district court affirmed, but we reversed, concluding that her absences due to her incapacitating mental illness did not constitute disqualifying misconduct. *Id.* at 222. We noted that she had not violated her company's policy that authorized termination after three days' unreported absence. *Id.* at 221–22. We found the record "establish[ed] as a matter of law that she was 'unable [to] protect her own interests at that time, in particular, she was unable to call her employer each day to report her absence.' " *Id.* at 222. We relied on testimony of her treating physician that her "serious mental condition" rendered her unable to communicate. *Id.* I do not equate Irving's incarceration on charges of domestic abuse with an

---

[6]The administrative rule in effect at the time of Roberts's denial of benefits stated,

> *Excessive absenteeism.* Excessive absenteeism is an intentional disregard of the duty owed by the claimant to the employer and shall be considered misconduct.

*Roberts,* 356 N.W.2d at 222 (quoting Iowa Admin. Code r. 370—4.32(7) (1984)).

incapacitating illness.  Irving's case is more like *Higgins* and *Harlan* than *Roberts*.

Courts in other jurisdictions have held that unexcused absences attributable to incarceration disqualify claimants from unemployment benefits even when benefits are allowed for absences due to illness.  A New Jersey appellate court concluded that incarceration was not analogous to an illness causing excusable absenteeism.  *Fennell v. Bd. of Review*, 688 A.2d 113, 115 (N.J. Super. Ct. App. Div. 1997).  The majority mislabels *Fennell* as an "outlier" without acknowledging many other decisions reaching the same result.  *See, e.g., Bivens v. Allen*, 628 So. 2d 765, 766–67 (Ala. Civ. App. 1993); *Weavers v. Daniels*, 613 S.W.2d 108, 109–10 (Ark. Ct. App. 1981); *Camara v. Marine Lubricants*, No. N12A–05011–DCS, 2013 WL 1088334, at *3–4 (Del. Super. Ct. Feb. 25, 2013); *In re Karp*, 692 N.Y.S.2d 516, 517 (App. Div. 1999); *Beatty v. Unemployment Comp. Bd. of Review*, No. 1331 C.D. 2008, 2009 WL 9097018, at *2 (Pa. Commw. Ct. Jan. 28, 2009).

*Fennell* fits like a glove with Iowa's "personal responsibility" cases. Ricky Fennell, a hospital employee, was jailed for nine months on pending assault charges.  *Fennell*, 688 A.2d at 113.  He was unable to make bail and "made all reasonable efforts to get his employer to hold his job open until his release."  *Id.* at 113–14.  He was terminated after missing work for three months and applied for unemployment benefits after the hospital declined to rehire him upon his release from jail.  *Id.* at 114.  The agency "upheld the denial of benefits because [his] reason for leaving his job was incarceration, a personal problem not attributable to work."  *Id.*  The appellate court affirmed, stating,

> Here appellant's reason for leaving work was his personal problem, incarceration on criminal charges and his inability to raise enough money to post bail.  These

unfortunate economic and legal problems were not related to his employment. Nor is an employee's intent to quit either relevant or controlling, unless the judicially-created exception for illness is implicated.

*Id.* at 115. The *Fennell* court declined to apply New Jersey precedent—that state's counterpart to *Roberts*—allowing benefits when the absence from work is attributable to illness. *Id.* at 114–15. While noting a split in authority, the *Fennell* court noted, "Other jurisdictions routinely deny claims [for unemployment benefits] where incarceration causes an absence from employment." *Id.* at 116 (collecting cases).

Similarly, a Delaware court recently equated incarceration for a domestic dispute to a personal matter:

> Appellant informed the Board that his arrest was generated by a personal matter—his wife called the authorities. The Court does not intend to delve into the domestic relations between Appellant and his wife; however, there can be nothing more personal than matters of the home. So, too, strained domestic relations are beyond the employer's control. Thus, the Board determined that . . . Appellant's incarceration was personal and not work related and, therefore, Appellant had voluntarily left his employment.

*Camara*, 2013 WL 1088334, at *3; *see also Bivens*, 628 So. 2d at 766–67 (holding claimant incarcerated for seven days was not entitled to benefits); *Weavers*, 613 S.W.2d at 109–10 (holding employee incarcerated and unable to post bail was properly denied unemployment benefits for misconduct); *Karp*, 692 N.Y.S.2d at 517 (holding claimant who was arrested and did not post bail committed disqualifying misconduct); *Beatty*, 2009 WL 9097018, at *2 (collecting cases and observing that "[i]t is well established that incarceration is not a reasonable or justifiable absence from work"). I find these authorities persuasive.

Irving argues she was innocent of the charge of domestic abuse, pointing to her partner's recantation months later. It is unclear whether the majority relies on her innocence, the lack of a conviction, or her

inability to post bail to require benefits. We recently reiterated that victims often recant in domestic abuse cases. *State v. Smith*, 876 N.W.2d 180, 187–88 (Iowa 2016) (citing authorities concluding that many victims recant); *id.* at 194 (Waterman, J., dissenting) (citing additional authorities estimating "[t]he rate of recantation among domestic violence victims [is] . . . between eighty and ninety percent"). Employers and the EAB should not be put in the untenable position of determining the actual guilt or innocence of jailed employees or whether voluntary conduct landed them in jail.[7] As other courts have concluded, actual innocence is irrelevant to the fact the employee is not showing up for work. *See, e.g., In re Bishop*, No. A-6222-06T16222-06T1, 2009 WL 36444, at *3 (N.J. Super. Ct. App. Div. Jan. 8, 2009) ("Bishop's absence from work for more than sixty days is undisputed. That he was incarcerated on charges that were eventually dismissed is irrelevant since his custodial confinement was unrelated to this employment."). A Delaware court aptly observed,

> Public policy . . . does not support the theory that an employee is available for work while incarcerated and that such a situation requires an employer to hold the job for someone who is indefinitely absent. The purpose of having an employee is for them to work. To require that employers keep a job open for those employees who become incarcerated or risk having to pay unemployment benefits is unreasonable and against . . . public policy . . . .

---

[7]Federal regulations require prompt determinations on eligibility for unemployment benefits. *See* Iowa Code § 96.11(10) (2013) ("[T]he department shall cooperate with the United States department of labor to the fullest extent consistent with the provisions of this chapter . . . ."). In order to comply with federal regulations, the state must issue sixty percent of first-level benefit appeal decisions within thirty days of the date of appeal and at least eighty percent of first-level benefit appeal decisions within forty-five days. 20 C.F.R. § 650.4(b) (2013). Needless to say, the wheels of justice often spin more slowly in criminal cases.

*Mason v. Best Drywall*, No. C.A. 98A-07-005-RSG, 1999 WL 459303, at *3 (Del. Super. Ct. 1999) (footnote omitted).

I disagree with the majority that Minnesota caselaw supports Irving. In *Jenkins v. American Express Financial Corp.*, a divided Minnesota Supreme Court adopted a fact-specific, case-by-case approach and concluded the employer's unfulfilled promise to verify Jenkins's employment for work release prevented her from continuing to work and entitled her to unemployment benefits. 721 N.W.2d 286, 290–92 (Minn. 2006). *Jenkins* is distinguishable because it is undisputed that UIHC played no role in Irving's initial incarceration or its duration. Moreover, the *Jenkins* dissent concluded that not showing up for work is disqualifying misconduct. *Id.* at 294 (Gildea, J., dissenting). Quoting the purpose of the Minnesota Act, the dissent stated, "Jenkins did not lose her job 'through no fault of her own.' She lost her job because she did not show up for work." *Id.* (quoting Minn. Stat. § 268.03, subdiv. 1 (2004)). I agree with the dissent.

Significantly, Minnesota appellate courts after *Jenkins* have routinely held that persons missing work due to incarceration are disqualified from unemployment benefits. *See, e.g.*, *Luhman v. Red Wing Shoe Co.*, No. A14–1193, 2015 WL 134211, at *3 (Minn. Ct. App. Jan. 12, 2015) (affirming denial of benefits when employee missed three workdays due to incarceration); *Millis v. Martin Eng'g Co.*, No. A11–2085, 2012 WL 3892191, at *2 (Minn. Ct. App. Sept. 10, 2012) ("An employer has a right to expect an employee to work when scheduled."); *Lavalla v. Am. Red Cross Blood Servs.*, No. A11–782, 2012 WL 1380327, at *3 (Minn. Ct. App. Apr. 23, 2012) (rejecting chemical dependency excuse for incarceration); *Miller v. SDH Educ. W. LLC*, No. A08–1169, 2009 WL 1684442, at *2 (Minn. Ct. App. June 16, 2009) ("When an employee

misses work because of incarceration, ordinarily his absenteeism is deemed to be his own fault and to constitute employment misconduct."). Even under Minnesota's case-by-case, fact-specific approach, Irving is disqualified based on the agency finding that her extended absence from her job at the UIHC was unauthorized by her employer.

Today's decision replaces a clear rule with uncertainty. It remains to be seen whether everyone unable to make bail will be entitled to collect unemployment benefits for the resulting job loss, or only those who avoid a conviction. The majority leaves employers guessing.

For these reasons, I dissent in part.

Mansfield and Zager, JJ., join this special concurrence in part and dissent in part.